Sowers *v.* Ohio Civil Rights Commission et al.

118

(No. 79155—Decided October 3, 1969.)

Common Pleas Court of Trumbull County.

128

*Mr. Richard de Nobel*, for respondent-plaintiff.

*Mr. Paul W. Brown*, attorney general, and *Mr. William H. Grubbs*, for defendant Ohio Civil Rights Commission.

*Mr. David Griffith*, prosecuting attorney, and *Mr. Raymond E. Schryver*, for Newton Falls Board of Education.

WINTER, J. (of Medina County, by assignment). At the July 31, 1969, hearing before this court, rulings on two motions by counsel for the respondent-plaintiff herein, were deferred pending the filing of briefs by the respective parties on or before the 11th day of September, 1969. Accordingly, upon consideration of said briefs, now filed by respondent-plaintiff and the defendant Ohio Civil Rights Commission, and upon review of the transcripts and the exhibits in question the court finds:

1. As to motion for clarification as to the right of the Attorney General to represent the Ohio Civil Rights Commission in matters other than on the Commission hearing level, that the Attorney General, by virtue of the provisions of Sections 109.02 and 4112.05(B), Revised Code (being chief law officer for the state of Ohio and for all of its departments), is the legal representative of the defendant, Ohio Civil Rights Commission, not only on such commission hearing level, but with respect to all other legal matters as well.

2. As to motion to have C & R Exhibits 4, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 26, 27, 28, and Sowers Exhibit 2 admitted in evidence, that according to the record of the commission hearings, November 9, 1967, and December 4, 1967, the subject exhibits were, upon agreement of the parties, first admitted by the hearing examiner during the course of the November 9th hearing and, subsequently, during the December hearing, rejected or, in the words of said hearing examiner, "knocked out," on the grounds that they were concerned with conciliation attempts of the defendant-commission and were, therefore, inadmissible in the record of said commission's proceedings.

This court, upon examination of the exhibits in question and the transcript of the proceedings before the defendant-commission, is of the opinion that, for what they are worth, such exhibits should be admitted for the purposes of this proceeding, excepting, however, pages 2-6 and 2-7 of Sowers Exhibit 2, said pages being the conciliation proposal of the Ohio Civil Rights Commission.

It is to be noted that eight of the fifteen exhibits in question, namely, C & R Exhibits 4, 8, 9, 14, 17, 26, 27 and 28 are copies of, or a portion of a copy of, minutes of various meetings of the Newton Falls Board of Education. Section 3313.26, Revised Code, provides that:

"The clerk of the board of education shall record the proceedings of each meeting in a book provided by the board for that purpose, which shall be a *public* record. * * *" (Emphasis added.)

Certainly, if proceedings of meetings of boards of

education are available to the public they are available to this court.

The remaining seven exhibits, namely, C & R Exhibits 7, 10, 11, 12, 13, 16 and Sowers Exhibit 2 (pages 1, 2-1, 2-2, 2-3, 2-4 and 2-5), are copies of letters and reports by investigators and representatives of the defendant-commission and the assistant prosecutor, all of which appear to be more or less of common knowledge to all concerned with the subject controversy, and which are referred to in the transcript of the hearing before defendant-commission's examiner, Robinson, who rejected said exhibits, despite the stipulation of the parties that all exhibits were to be admitted.

The court assumes that the hearing examiner's ruling rejecting the aforesaid exhibits was based on the provisions of Section 4112.05, Revised Code, which reads:

"* * * If it [commission] determines after such investigation that it is probable that unlawful discriminatory practices have been or are being engaged in, it shall endeavor to eliminate such practices by informal methods of conference, conciliation, and persuasion. Nothing said or done during such endeavors shall be disclosed by any member of the commission or its staff or be used as evidence in any subsequent proceeding. * * *"

In the opinion of the court the language of the statute excluding the use of reference to such endeavors as evidence is bottomed on the same rationale as is the general rule of law which holds that an offer to compromise or settle a disputed claim will not be received as an admission of the party making the offer. However, this rule, excluding evidence of offers of compromise and negotiations for compromise, does not preclude the introduction of evidence of independent statements of fact material to a cause of action or defense made by a party (see 21 Ohio Jurisprudence 2d 335). The words "conference, conciliation" and "persuasion" as used in the statute, in the opinion of this court, are limited to conscientious efforts on the part of the defendant-commission to resolve a dispute and, as such, are not to be tainted by threat, coercion or undue pressure

exerted to effect a settlement. It is to be noted that a further modification of the general rule with respect to admissibility of offers to compromise appears to obtain in the case of threats made during such negotiations (see 15 A. L. R. 3d 27).

Accordingly, respondent-plaintiff's motion to admit the aforesaid enumerated exhibits is hereby sustained.

The issue before this court, simply stated, is: Did respondent-plaintiff Sowers on January 11, 1967, engage in unlawful discriminatory practices when, as a member of the Newton Falls Exempted Village Board of Education, he voted against hiring one, Dr. Tobasco, as superintendent of schools for two years at an annual salary of $14,000?

However, in order to determine the issue herein, other questions must first be answered. Plaintiff's petition alleges that the proceedings, decision and orders of the defendant-commission are illegal and unconstitutional for ten (10) reasons. The defendant's brief suggests five (5) reasons why the commission's order should be affirmed. The court, coming now to consider these reasons advanced by the parties, is of the opinion that the following are the pertinent questions to be answered in the case at bar:

1. Were the complainants, Phillips and Steigner, proper parties within the meaning of Section 4112.05, Revised Code, to file charges in the instant case?

2. Was the plaintiff-respondent, Sowers, individually, an "employer" within the meaning of Section 4112.01 (B), Revised Code, on January 11, 1967, when the motion to hire Dr. Tobasco was presented to the board of education?

3. Was the proposed hiring of Dr. Tobasco an action prohibited within the meaning of Section 3319.01, Revised Code?

4. Did the respondent-plaintiff cast the deciding vote against hiring Dr. Tobasco on January 11, 1967?

5. Were the so-called "conciliation proposals" of the defendant-commission compatible with legislative intent as expressed in the language " * * * endeavor to eliminate such practices by informal methods of conference, concilia-

tion, and persuasion * * *,'' Section 4112.05 (B), Revised Code?

6. Were the defendant-commission's Findings of Fact and Conclusions of Law supported by reliable, probative, and substantial evidence?

7. Did the defendant-commission's order of September 26, 1968, violate the respondent-plaintiff's constitutional civil liberties of freedom of speech and freedom of religion?

Before attempting to answer these questions this court is of the opinion that some discussion is in order concerning what appears to be a confused conception of the term "civil rights." The facts of this case seemingly are illustrative of this observation. As stated in 15 American Jurisprudence 2d 406: " 'Civil rights' have been defined simply as such rights as the law will enforce, or as all those rights which the law gives a person." I. e., a civil right is a legally enforceable claim of one person against another.

"Natural rights" are those rights which appertain originally and essentially to each person as a human being and are inherent in his nature, as contrasted to civil rights, which are given, defined and circumscribed by such positive laws, enacted by civilized communities, as are necessary to the maintenance of organized government, *Byers* v. *Sun Savings Bank*, 41 Okla. 728, 139 P. 948.

Professor Pollack, 27 Ohio State Law Journal 567, points out that indiscriminate use of the term "rights" to describe an immunity, or privilege, has fostered confusion in the law. Our constitutional government was originally framed on a system of limited powers, reserving rights in individuals. "However," says Pollack:

"* * * what were reserved in this context were not actually rights but immunities—restraints on the government."

Accordingly, the distinction between claims and immunities becomes increasingly important in relation to our consideration of problems arising from alleged violations of our Ohio Civil Rights Act.

President Kennedy carefully drew this distinction,

identifying immunities as civil liberties, and claims as civil rights. He said:

"The Bill of Rights, in the eyes of its framers, was a catalogue of immunities, not a schedule of claims. It was, in other words, a Bill of Liberties * * *. When civil rights are seen as claims and civil liberties as immunities, the government's differing responsibilities become clear. For the security of rights the energy of government is essential. For the security of liberty restraint is indispensable."

In line with this distinction, civil, or economic rights, functioning as claims, are structured in legislation, while civil liberties are constitutionally protected.

Pollack goes on to say that this distinction and separation wisely suggests a constitutional definition of historic rights and a developmental pattern of economic and social activities through legislation. He further states:

"Liberty is preserved through constitutional assurances that prevent governmental encroachments, and economic and social change is re-enforced by legislative action."

Civil rights then, within the meaning of Sections 4112.-01 to 4112.08, inclusive, and 4112.99, Revised Code, are economic rights functioning as legally enforceable claims which are structured in legislation. On the other hand civil liberties are natural rights which appertain originally and essentially to each person as a human being and are inherent in his nature; such rights, which are constitutionally protected, are not actually rights but are immunities, or restraints on government.

The objective of the Ohio Civil Rights Act, Sections 4112.01 to 4112.08, inclusive, Revised Code, as the purpose clause indicates (128 Ohio Laws 12), is to prevent and eliminate the practice of discrimination, against persons because of their race, color, religion, origin or ancestry, and to create a commission to enforce the same, and to define its powers and duties.

Thus, the Ohio General Assembly, by legislative enact-

ment effective July 27, 1959, gave to those persons whose civil rights were violated, a legally enforceable claim against the violator. This enactment, however, was not expressive of any legislative intent to interfere with the preservation of the constitutional assurances that prevent governmental encroachments. And it is this balance between civil rights as claims, and civil liberties as immunities, that the courts must weigh carefully and judiciously in all controversies such as the case at bar.

The desires of those who mean well for the so-called "underdog" and "downtrodden" minorities must not be permitted a blank-check utilization of the provisions of the Fair Employment Act as a launching pad for indiscriminate witch-hunts, nor as a vehicle for overzealous public administrative agencies, not bound by the established common-law rules of evidence prevailing in courts of law and equity, to make conclusive arm-chair judgments as to the facts of a given case unless such findings of facts are convincingly supported, of record, by reliable, probative, and substantial evidence.

Examination of the facts of the instant case indicate, in the words of respondent-plaintiff's brief: "* * * as nice a school board fight as can be imagined." The progress report of Acting Regional Director Lieb of the defendant-commission, dated June 20, 1967, states, when referring to the board meeting of March 2, 1967, with the defendant-commission's staff:

"In the heated discussion which ensued, it became evident that the present controversy is only the latest in a long line of disagreements stemming from personality clashes and hostile feelings among certain board members."

And, that while, in the same report Acting Director Lieb states: "* * * there was no doubt that Rev. Sowers' comments and vote constitute unlawful discriminatory acts, * * *" the record of the November and December 1967, hearings before the defendant-commission's hearing examiner, in the opinion of this court, fail to support this finding by reliable, substantial and probative evidence.

Further, defendant-commission's Findings of Fact,

Conclusions of Law and Order, dated September 28, 1968, page 1, paragraph 2, states, in referring to the application of Dr. Tobasco:

"* * * who had *duly* applied for the vacant position of superintendent of schools." (Emphasis added.)

While the transcript of the defendant-commission December 4, 1967, hearing, shows that Dr. Tobasco on cross-examination responded as follows:

"Q. Did you make a formal application with the Board for the position? A. No, sir."

On the other hand, respondent-plaintiff Sowers who stated that he voted against Tobasco on the grounds of experience rather than religious affiliation at the January 11, 1967, board meeting, apparently, chose to discuss the Catholic philosophy of education, assuming Tobasco was a Catholic, and admittedly making the statement that he could not conscientiously vote for a Catholic because of the Catholic philosophy of education.

Impartial review of the proceedings makes it difficult to determine whether or not the episode in question was a "school boy's dispute" or a "school board's controversy."

Matters of this character are better settled by the application of common sense and reason than by judicial determination. It is unfortunate that acts of legislative bodies must all too frequently be tested by a set of facts and surrounding circumstances that should never reach the point of litigation.

Turning now to the questions presented in this case, the court will deal with them in the same order as they were previously herein stated:

First: Were the complainants proper parties to initiate the action against the plaintiff-respondent Sowers?

It is to be noted that the Fair Employment Acts of most states require that the complaint against discriminatory employment practices be filed by the aggrieved individual or his attorney. This feature is one of the distinctions of the Ohio Act. Section 4112.05 (B) provides that:

"Whenever it is charged in writing and under oath

by a person, referred to as the complainant, that any person, referred to as the respondent, has engaged or is engaging in unlawful discriminatory practices * * * the commission may initiate a preliminary investigation."

The language of Section 4112.01 *et seq.*, Revised Code, makes it clear that any person may file charges with the commission provided they are in writing and under oath. There is no requirement that actions can be commenced only by the aggrieved party.

Accordingly, complainants, Phillips and Steigner, were proper parties, within the meaning of the statute to file the affidavits of charge against respondent Sowers, and this court so finds.

SECOND: Was the respondent-plaintiff Sowers, individually, an "employer" within the meaning of a section of the Ohio Fair Employment Act?

Section 4112.01 (B), Revised Code, reads:

" 'Employer' includes the state, or any political or civil subdivision thereof, any person employing four or more persons within the state, and any person acting in the interest of an employer, directly or indirectly."

Black's Law Dictionary, Fourth Edition (West Publishing Company), defines the term:

"One who employs the services of others; one for whom employees work and who pays their wages or salaries. The correlative of 'employee.' "

In the case of *Marting* v. *Groff*, 82 Ohio Law Abs. 212, the Court of Appeals said:

"An action against a board of education must be brought against the board in its corporate capacity, and not against the individuals constituting the board."

And 48 Ohio Jurisprudence 2d 750, states:

"The board of education of each school district is constituted a body politic and corporate."

This court is therefore of the opinion that respondent-plaintiff, in voting on the motion to hire Dr. Tobasco January 11, 1967, was acting in his official capacity as a member of the board of a corporate entity and as such he was not individually an "employer" within the meaning of the statute, and it is so found.

THIRD: Was the proposed hiring of Dr. Tobasco an action prohibited within the meaning of Section 3319.01, Revised Code?

This statute, which makes provision for the appointment of a superintendent by the board of education of an exempted village school district states:

"No person shall be appointed to the office of superintendent who is not possessed of a certificate of the superintendent type * * *."

This court does not concur in defendant-commission's position that:

"Offering of the position is not an appointment. Had the Board offered the position to Mr. Tobasco, he could easily have acquired a certificate by the time of his appointment."

An unconditional offer of a position requires only an acceptance to make it a binding contract. Thus the appointment, as referred to in Section 3319.01, Revised Code, would be contingent only upon the acceptance of the offeree, regardless of the fact as to whether or not he possessed the proper type of superintendent certificate. Such a unilateral contingency was not contemplated by the Legislature in its enactment of this statute, on the contrary, the aforesaid language imposes upon a board of education an absolute prohibition from offering to one, not possessed of the proper certificate, the position of superintendent. And this court so finds.

FOURTH: Did the respondent-plaintiff cast the deciding vote against hiring Dr. Tobasco January 11, 1967?

The uncontroverted evidence shows that on the night in question the entire membership of the board (five) were present; that they voted in the following order:

First— Harnish— Nay
Second— Phillips— Aye
Third— Steigner— Aye
Fourth— Sowers— Nay
Fifth— Montgomery—Nay;

and that the motion to hire Dr. Tobasco (made by Phillips, seconded by Steigner) lost.

It is to be noted that had respondent-plaintiff abstained

from voting at the board meeting of January 11, 1967, the result would have been a tie and the motion would have failed for want of a majority vote. The respondent-plaintiff could have cast the "deciding vote" only had he voted for the motion to hire Dr. Tobasco. Since he did not it cannot now be said that his vote was the deciding one, and this court so finds.

FIFTH: Were the defendant-commission's proposals compatible with the legislative intent to eliminate discriminatory practices by informal methods of conference, conciliation and persuasion as provided in the statute?

According to the *Ohio Civil Rights Commission Annual Report (1966)* the Ohio Act:

"* * * establishes an administrative commission charged with eliminating unequal treatment of minority groups through 'informal methods of conciliation and persuasion' which removes the expense, inconvenience, and haphazardness of court action."

If the commission determines there is probable cause to believe discriminatory practices have occurred the statute requires that it attempt to induce compliance by informal methods before a formal hearing may be instituted (see 29 Ohio State Law Journal 466, 1968).

In the instant case certain endeavors were undertaken and so-called conciliation proposals made by the defendant-commission. However, it is the opinion of the court that the defendant-commission's proposals of March 6, 1967, April 5, 1967, and those subsequently incorporated in the minutes of the board of education meetings July 10, 1967, August 14, 1967, read more like mandates than suggestions for amicable settlement.

For example, the letter of March 6th states that "board of education *shall* take the following action: * * *"; the letter of April 5th states "the * * * Northeast Regional Office forwards the following guidelines *for future school board action* in the matter now under investigation: * * *"; the proposal incorporated in the minutes of July 10, 1967, Item III "respondent (board of education) *shall* * * * arrange a special meeting of the Newton Falls School Board

* * * during such meeting the Newton Falls School Board *will proceed with the necessary measure(s) to remove Reverend Austin E. Sowers from membership on its body.*''; and the final proposal incorporated in the board meeting minutes of August 14, 1967 reads: ''III, respondent Austin E. Sowers *shall forthwith and hereafter exclude himself from and take no part in any discussion, motion, vote, or any other board activity relating to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment.*'' (Emphasis added.)

It is obvious that the legislative intent to eliminate discriminatory practices by informal methods of conference, conciliation and persuasion, as provided in Section 4112.05 (B), Revised Code, was to encourage amicable settlement in those cases where probable cause had been found. Directives and ultimata issued by the commission do not, however, comport with such legislative intent, and this court so finds.

SIXTH: Were the defendant-commission's Findings of Fact and Conclusions of Law supported by reliable, probative, and substantial evidence?

As previously indicated, only the first of defendant-commission's Findings of Fact, namely, that on January 11, 1967, respondent-plaintiff voted against hiring Dr. Tobasco as superintendent because of religious discrimination; and its first Conclusion of Law, that respondent-plaintiff engaged in an unlawful discriminatory practice in violation of Section 4112.02(A), Revised Code, are material in the within cause.

As to said Finding of Fact and Conclusion of Law this court finds that neither are supported by reliable, probative and substantial evidence. Aside from the answers hereinbefore given to questions ''Second, Third'' and ''Fourth,'' the record shows that Phillips' motion January 11, 1967, provided for a salary of $14,000 a year, rather than $12,000 as contained in the qualifications provided by the board at that time; that Tobasco, by his own admission had not filed a formal application for the position of super-

intendent; that defendant-commission's representative Hunter testified that there was nothing in the record to indicate any religious discrimination on the part of Mr. Sowers; that the memo of defendant-commission's representative Gibb admits that the fixing of experience requirements represents an ''overextension of our prerogatives''; that testimony of the respondent-plaintiff indicated that he voted against the hiring of Dr. Tobasco because of his lack of experience; and finally Peter Nolan's testimony that respondent-plaintiff voted against Tobasco because of what he called the Catholic Philosophy of Education (not religion).

Reliable, probative and substantial evidence has been defined by the court in the case of *Ohio Real Estate Commission* v. *Cohen*, 90 Ohio Law Abs. 137, 139, as follows:

''Reliable, that is, means dependable, with reasonable assurance of its probability, as not only truthful but also true.

''Probative relates to the evidentiary value of the testimony and other evidence in an analytical sense, having depth and being more than merely superficial or speculative.

''Substantial would mean that the evidence has body or substance of sufficient degree to be of some weight, as well as quality, that gives it standing and credence, as well as dependable and trustworthy.''

From the facts of this case, as enumerated in the previous paragraph, the history of bickering and dispute within the membership of the board, along with the further fact that from the evidence adduced reasonable minds could conclude that the minority members of the board (being so insistent that Dr. Tobasco be hired as superintendent, with or without qualifications) were engaging in a discriminatory practice by so favoring Dr. Tobasco. And, therefore, it is the judgment of this court that the evidence herein does not support the defendant-commission's finding of fact and conclusion of law with respect to the respondent-plaintiff to the extent that it is reliable, probative and substantial within the meaning of the statute.

SEVENTH: Did the defendant-commission's order of September 3, 1968, violate the respondent-plaintiff's constitutional civil liberties of freedom of speech and freedom of religion?

With respect to freedom of speech it is generally understood that:

"The right to freely express one's opinion is guaranteed by the Constitution of the United States and by the Constitution of the state of Ohio * * * These are fundamental freedoms and are the pillars on which all others rest. * * * Accordingly, these are given a broad scope." (10 Ohio Jurisprudence 2d 534, Section 460.)

With regard to freedom of religion, it is expressly guaranteed in the Ohio and in the Federal Bill of Rights. It is also included among the liberties which are protected from state action by the Fourteenth Amendment to the Constitution of the United States.

"The Ohio Constitution adopts the doctrine of 'hands off.' It secures to every citizen of the state the fullest liberty of conscience in matters of religion." 10 Ohio Jurisprudence 2d 579, Section 508.

It is important to note that state fair employment acts do not force an employer to hire employees because they belong to a particular minority group. Such laws merely demand that the same employment criteria be applied to all persons regardless of race, religion, etc. These state laws are considered valid by most authorities as a reasonable exercise of the police power. This is sufficient to make them constitutional as against claims of deprivation of liberty of contract and freedom of association. However, as the case of *West Coast Hotel Co.* v. *Parrish* (1937), 300 U. S. 379, points out, only a reasonable exercise of police power to protect public welfare, health, and peace will be sustained. The determinative question then is: Does fair employment legislation, such as the Ohio Act, come within the purview of providing for public welfare. More specifically, the question to be asked is whether the discrimination in employment is detrimental to the public generally. (See 16:608 Western Res. Law Journal 628-630 (1965).)

In the opinion of this court there is no doubt as to the constitutionality of the act itself; it is, however, the abuse of the authority therein granted that is of concern here. Keeping in mind the distinction between civil rights as claims that are structured in legislation, and civil liberties as immunities that are constitutionally protected, the effect, as Professor Pollack (supra) has stated:

"* * * is a discordant variety of protection under each conceptual category, although all are identified as 'rights.' Since the conceptions affect powers and benefits differently, they should be viewed hierarchically and not kaleidoscopically."

It is this balance between civil rights and civil liberties, as was pointed out previously, that must be weighed carefully in all cases such as the one at bar.

It is the finding of this court that the defendant-commission's order directed to the respondent-plaintiff that:

(a) He cease and desist from all practices designed to deny employment because of race, color, religion, national origin or ancestry or otherwise discriminate directly or indirectly in any matter related to employment; and

(b) abstain from taking part in consideration, deliberation, voting or any other activities of the board of education in matters directly or indirectly related to employment until such time as he has given written assurance that he will take part in such activities without regard to the religion of any employee or prospective employee,

in view of the facts surrounding this case and, further, in view of the board of educations' conciliation proposal adopted July 17, 1967 (seconded by respondent-plaintiff and voted for by him), wherein the board reaffirmed their promise, individually and collectively, to comply with all provisions of the state and federal laws applying to nondiscrimination in the operation of the Newton Falls school system, did violate the respondent-plaintiff's constitutional civil liberties of freedom of speech and freedom of religion.

Accordingly, it is the general finding of this court that respondent-plaintiff, Sowers, did not engage in un-

lawful discriminatory practices when, as a member of the Newton Falls Exempted Village Board of Education, he voted against hiring one, Dr. Tobasco as superintendent of schools for two years, at an annual salary of $14,000.

The order of defendant-commission of September 26, 1968, is hereby set aside.

*Judgment accordingly.*