IRON WORKERS LOCAL NO. 67 and
William Reed, Appellants,

v.

John HART and Iowa Civil Rights Com-
mission, Appellees.

No. 54741.

Supreme Court of Iowa.

Nov. 11, 1971.

758

Hawkins, Hedberg & Ward, Des Moines, for appellants.

Richard C. Turner, Atty. Gen., and Roxanne Barton Conlin, Asst. Atty. Gen., for appellees.

REYNOLDSON, Justice.

Iron Workers Local No. 67 and William Reed appeal from district court's decree

modifying and affirming an order entered by Iowa Civil Rights Commission in an unfair employment practice proceeding under chapter 105A, Code, 1971. We affirm in part and reverse in part.

This is the first appeal to reach our court calling for an interpretation of chapter 105A (Iowa Civil Rights Act of 1965). For this reason, a detailed treatment of this law, and the facts, is required. Section 105A.3 creates the Iowa Civil Rights Commission (Commission), consisting of seven members appointed by the governor with the advice and consent of the senate. One of the Commission's duties is receiving, investigating and passing upon complaints alleging unfair or discriminatory practices. (§ 105A.5(2)).

Section 105A.7 describes unfair or discriminatory employment practices. Specifically pertinent to this case is § 105A.7(1) (c):

"1. It shall be an unfair or discriminatory practice for any:

\*   \*   \*   \*   \*   \*

c. Employer, employment agency, labor organization, or the employees, agents, or members thereof to directly or indirectly advertise or in any other manner indicate or publicize that individuals of any particular race, creed, color, sex, national origin, or religion are unwelcome, objectionable, not acceptable, or not solicited for employment or membership, unless based upon the nature of the occupation."

Entitled "Complaint-hearing", § 105A.9 permits any person (defined in § 105A.2(2) to include, among others, individuals and corporations) claiming to be aggrieved by a discriminatory or unfair practice to file a verified complaint. The complaint must state the name and address of the person or organization alleged to be guilty of the unfair practice and particulars thereof. This precedes registered mail delivery of a copy to the claimed offender and investigation by Commission. If the investigating official finds probable cause for complaint, he must attempt to eliminate the practice through conference, conciliation and persuasion.

If further action is required, notice is given to respondent, who shall answer "the charges of such complaint" within ten days (§ 105A.9(5)). Notice of time and place of hearing issues.

Of particular importance here is § 105A.9(12):

"12. If, \* \* \* the commission shall find that a respondent has engaged in \* \* \* any discriminatory or unfair practice as defined in this chapter, the commission \* \* \* shall issue and cause to be served upon such respondent an order requiring such respondent to cease and desist from such discriminatory or unfair practice and to take such affirmative action, including, but not limited to, hiring, reinstatement, or upgrading of employees, with or without back pay, the referring of applicants for employment by any respondent employment agency, the admittance or restoration to membership by any respondent labor organization, the admission to or continuation in enrollment in an apprenticeship program, on-the-job training program, the posting of notices, and the making of reports as to the manner of compliance, as in the judgment of the commission shall effectuate the purposes of this chapter."

Hearing on appeal to the district court from Commission order shall be tried in equity and shall be de novo (§ 105A.-10(6)). The court may receive additional testimony and may affirm, modify or reverse Commission's order. Review by this court is provided (§ 105A.10(7)) and is also de novo. Rule 334, Rules of Civil Procedure.

The record reveals The Weitz Company, Inc. (Weitz) is a construction enterprise. It contracted with United States government to construct a new post office facility

in Des Moines. In addition to the now customary contractual provisions forbidding minority discrimination, Weitz was required to have an affirmative action plan for employment of minority persons. John W. Webb (Webb) was post office department contract compliance officer charged with enforcing the equal opportunity provisions.

By contract, Iron Workers Local 67 (Local 67) is exclusive bargaining representative for all iron worker employees of Weitz. The latter calls the local hiring hall for iron workers. William Reed (Reed) is business representative of Local 67. In a preconstruction meeting he resisted the efforts of Webb to initiate a plan to utilize the members of the black community on the project. John J. Hart, Jr. (Hart) is construction manager for the Des Moines office of Weitz. He felt he had an agreement with Reed that Joseph D. Roe (Roe), a black laborer employed by Weitz, would be given a work permit on or about April 1, 1969 by Local 67 and put on the job to satisfy federal contractual requirements. While Reed never denied such an arrangement, the work permit was not forthcoming. On April 23, 1969, at Webb's insistence, Hart sent Roe and a Weitz official to Local 67 offices. Hart forwarded a letter along explaining the action was taken at Webb's insistence and apologizing because the matter could not await Reed's reelection in June. Roe testified Reed said he could fill out an application but it wouldn't do any good.

The next day, April 23, 1969, Roe returned to Local 67, was issued a work permit and sent to the post office job. Reed soon appeared on the construction site, and talked with the iron workers. That afternoon, about five Local 67 members reported sick and left the job. The following morning, April 24, 1969, all the iron workers (approximately 11 in number) with exception of the foreman and Roe reported sick. Replacements were requested from Local 67. The same day Reed requested blacks from the Des Moines Apprenticeship Information Center for this job. Of the 11 men who appeared and were issued work permits, ten were black and all were inexperienced. Reed also called a meeting of the "sick" journeymen that night to persuade them to return to the construction.

On this same day, April 24, 1969, Hart filed complaint with the Commission. In the blank provided for complainant's name there is typed "Mr. John Hart, Vice President of Weitz Company, Incorporated." The signature "John J. Hart" appears on the line "Signature of Complainant". Following the printing "Statement of Charge" is typed,

"William Reed, Business Representative of Local 67 and the Iron Workers Local No. 67 have engaged in unfair labor practices against the Weitz Company and its employees in violation of Chapter 105A of the 1965 Iowa Civil Rights Act, as amended, by indicating through their actions that individuals of the Negro race are unwelcome, objectionable and not acceptable, and are not solicited for employment or membership."

That afternoon Alvin Hayes, Jr. (Hayes), executive director of Commission, visited Reed at the hiring hall. He testified, "Mr. Reed stated 'Well, you have to understand that there are some union people that are opposed to having blacks in the union.' He indicated that he himself was not prejudiced but he was powerless to do anything about the union workers who didn't want blacks on the job site." Hayes later sent a conciliation agreement to the union hall. It provided for recruiting and inviting minority members to become union members. Minority people were to be informed of procedure by which they might become iron workers. It provided for reports of efforts and progress made. This instrument was returned to the Commission. It had been torn in two, taped back together, and signed by Reed and the union president. Hayes testified the agreement had never been complied with by Local 67,

and this was not seriously disputed by the union.

The next morning, April 25, the union members, now recovered, and the 11 new permit holders, appeared on the job. The journeymen iron workers and the negro permit holders were all kept on by Weitz. The blacks eventually all quit or were let off because of inexperience or inability except Roe and John M. Branch (Branch). On May 20, 1969 Branch was severely injured when he fell about 25 feet. Branch testified he was hit in some manner, causing him to fall through a hole in the deck. Weitz's safety engineer testified he investigated and was satisfied Branch walked backwards into the hole while watching a load of steel being landed.

At the Commission hearing Roe testified,

"When I left in August, they had a lay-off and said they were keeping the journeymen with books and I was in the lay-off. I was working on a permit. * * * Bill (Reed) sent me word to come out * * *. I didn't go because I just didn't want to go anywhere else and that's why. I didn't want to go any-place else because there was no one I knew and I would be the only Negro there and I felt I knew the guys on the post office job so I didn't know how the rest of the guys felt about the whole thing so I would rather just leave it where it was so I took the Great Plains Bag job. I make $3.57 an hour at Great Plains Bag and made $5.27 an hour as an iron worker. * * * I felt while I was working for Weitz Company that I had some support, some protection given me by the Weitz Company."

He further testified he would not like to be an iron worker under the same or similar conditions as those he was employed under by Weitz.

Branch testified with reference to the other iron workers, "They didn't want you there and going to do everything they could to get rid of you." Don Law, a ne-gro, was sent to Local 67 in August 1969 through the apprentice training program. Two other blacks accompanied him. He testified they were sent on a roofing job, did not know how to do it, and got no instruction help from the union. They sat around the hiring hall for several days between jobs and felt some "hostility". Law took the test but never went back for the "oral examination" because he was discouraged and did not want to continue.

Aaron Carter, employed at the Apprentice Information Center, recruited minority group members in April 1969 and sent them to Local 67. Of 14 who were sent down, not one was admitted to the union. Only Mr. Law actually took a test. From talking to these blacks he developed the opinion Local 67 was attempting to discourage them.

Hart testified after he filed the complaint on April 24 he received about six telephone calls variously threatening him, his family, his home and the post office job. He did not recognize any of the voices calling. Pinkerton guards were hired for the construction site. A special deputy was hired to protect the home of Jack Anderson, a Weitz superintendent. Hart identified a written claim made to the post office department. It included a one and one-half day "overhead" loss of $1033.50, one-half of the wages paid the negro laborers ("50% efficiency") $1534.92, Pinkerton service for 14 weeks $4746.14, all totaling $7314.56.

Webb, the post office department compliance officer, testified after several meetings with Reed it was his opinion Local 67 was insensitive to receiving minority group members as union members.

Respondents called Charles A. Bruce, a negro, as a witness. He testified he had worked out of Local 67 for three years on a permit. He passed the apprenticeship test but had not requested the "oral test". He had not made up his mind to apply for membership in Local 67. As a permit holder, he paid $6.50 per week to the un-

ion. He had not observed any racial discrimination. Bruce sent John C. Francis, a black, to see Reed in the fall of 1969. The latter testified he was given a work permit and employment, and noticed no discrimination. Upon cross-examination he testified he had taken no tests and no one had told him if he worked for six months he would be eligible for union membership. Leonard Johnson, a negro, testified for respondents. His employment also started in the fall of 1969. He did not belong to Local 67 and intended to return to work for Economy Forms, a prior employer. He testified he was known as a trouble maker and fighter but had no trouble getting along with the iron workers. Nolen Fortner, a black, also testified he started working as a permit holder from Local 67 two or three months before the January 1970 hearing. His employer, Economy Forms, had been closed by strike. At hearing date he was back working for Economy Forms. He testified he was well treated by respondent union.

Reed testified he had been business representative of Local 67 five years. Prior to April 22, 1969, only one negro, Charles Bruce, had made application to obtain a work permit or become an apprentice. In response to communications addressed to certain agencies indicating the apprenticeship program was being opened for enrollment between July 1 and July 15, 1969, 36 applicants appeared. Ten were black. Of these, only Don Law took the test. He did not pass but was not so informed. Law did not take the "oral interview". The other blacks left for various reasons.

Reed further testified a black man who wanted to get in the apprentice program would have to make a written application, and furnish a medical report and high school diploma. Later he would be required to take seven aptitude tests on coordination and mechanics. The tests came from the International Association and "have been checked for cultural bias." Membership to the union is obtained through the apprenticeship or by working as an iron worker six months. In the latter case, a test would be given but it would be a different test. Apprentices are required to have an oral interview with the "Joint Board" consisting of three contractors and three union members. Membership in the union requires payment of over $350.00.

Reed denied he had told the iron workers to leave the post office job on April 23. He affirmatively testified he met with them the evening of April 24, told them to return to work, and they did.

At time of hearing Reed testified Local 67 had 309 members. Two were negro. The record is in conflict as to whether these two blacks or either of them became members before or after April 24, 1969. Reed swore they were Pinell Brown and Willie Brown, who became members on April 1, 1969 and May 20, 1969, respectively. They were fence builders and permanent employees of a company the union had "organized". A new classification of union member "fence erector" had been created.

Commission's order was dated May 13, 1970. It enjoined Local 67 from any harassment, coercion, or duress, against any person seeking membership. The union was further enjoined "from leaving a job or otherwise harassing any contractor giving employment to minority persons". Local 67 was directed to admit Joseph Roe to union membership and to submit to Commission an affirmative action program to recruit, solicit and admit minorities to its membership. The union was directed to issue work permits to all persons equally without regard to race, creed, color, religion or national background and to admit membership to "any persons who have completed six months of satisfactory employment on a work permit". It was ordered all persons be signed out on jobs from the union hall equally on a first come first served basis, within the framework of union operating procedure "except that a union member may not be given preference

solely on the basis of his membership". Local 67 was directed to report to Commission monthly commencing July 1, 1970 the number of minorities "contacted, issued work permits and admitted to membership", and the reports were to include "the reasons for rejection, denial of work permits and why membership was not granted". Such reports were to include "the names, addresses and telephone numbers of minorities contacted and the jobs to which they were assigned". All tests were to be validated for cultural bias and job relatedness and were to be first submitted to Commission along with proof of validation before being used.

In addition, the Commission rendered judgment in favor of Weitz and against Local 67 for $6000.00, and against Reed personally for $1314.56, to be paid within 60 days.

Local 67 and Reed petitioned for review to Polk County District Court. The case was there submitted on the transcribed record made before Commission. As a result of his de novo review, district court found Reed had caused union members to walk off the post office project under the subterfuge of illness because Weitz and Webb wanted to hire a black person through the union hiring hall on a work permit, he being otherwise qualified. He found the union and Reed had violated § 105A.7(1) (c) by indicating black persons were not welcome for employment or membership. By decree dated November 16, 1970, district court adopted Commission's order with only two changes. The direction to Local 67 to admit Roe and all others who had completed six months of satisfactory employment was conditioned that they be "qualified as measured by the usual qualifications for such status applicable to all other applicants". The judgment rendered by Commission was modified. Reed's obligation to pay was omitted, and the union's obligation was reduced to $1033.50, to be paid Weitz as damages for expenses incurred by that company as a result of the union's acts.

From that decree Local 67 and Reed appeal here, asserting as propositions relied on for reversal: 1) Hart is the complainant, he was not aggrieved by conduct of respondents, and the cause must therefore fail; 2) common law damages cannot be awarded under § 105A.9(12); 3) lower court decree is not in accord with the charge in the complaint nor with the evidence; and 4) § 105A.7(1) (c) is unconstitutional and void for vagueness and § 105A.9(12) is unconstitutional and void for improper delegation of power.

In considering these propositions and in construing provisions of chapter 105A, we note our Iowa constitution declares all men are, by nature, free and equal (art. I, § 1). This freedom and equality must and does extend into the areas of facilities, services, goods furnished to the general public, housing and employment practices.

"No working man should be deprived of the right to earn his industrial way on free and equal terms. In Judge Gewin's words, 'The ethic which permeates the American dream is that a person may advance as far as his talents and his merit will carry him.' Miller v. International Paper Co., 5 Cir. 1969, 408 F.2d 283, 294."—Clark v. American Marine Corporation, 304 F.Supp. 603, 607 (E.D. La.1969).

The Iowa legislation is another manifestation of a massive national drive to right wrongs prevailing in our social and economic structures for more than a century. Twenty-seven states have enacted similar but varying versions of the Model Uniform Anti-Discrimination Act. Analogous language but differing procedure is incorporated in the federal legislation, Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e et seq.), creating the Equal Employment Opportunity Commission.

In interpreting this legislation we also keep before us the admonition of the legislature that "This chapter shall be con-

strued broadly to effectuate its purposes" (§ 105A.11).

Respondents' propositions shall be treated here in the same order as set forth above.

I. *Status of Hart as aggrieved complainant.*

Respondents Local 67 and Reed argue Hart as complainant must show a personal right of his—not to be discriminated against because of *his* race, creed, color, sex, national origin or religion—was infringed upon in order to foundation a charge under chapter 105A. Otherwise, respondents insist, he has no standing in the case or cause and it should be dismissed.

Commission argues, apparently alternatively, that Hart is an aggrieved party, that as executive officer he was acting for Weitz, that our rules of procedure do not apply, and in any event this objection was not raised below and cannot be considered here (§ 105A.10(4)).

Local 67 and Reed rely on federal cases concerning standing of plaintiff to sue and provisions of federal rules of civil procedure. Cohen v. Public Housing Administration, 257 F.2d 73 (5 Cir. 1958); Colbert v. H–K Corporation, 295 F.Supp. 1091 (N. D.Ga.1968). Under the federal Equal Employment Opportunities Act (42 U.S.C., § 2000e et seq.) if the federal commission cannot obtain voluntary compliance, the person aggrieved is notified and a civil action may be brought against respondent in federal district court. Of course federal rules of procedure are there applicable, including those relating to real party in interest, standing, and class actions. These cases are not pertinent here, where the charge is litigated before the state commission.

In attacking respondents' proposition, Commission asserts it was not urged before it, and relies on § 105A.10(4):

"4. An objection that has not been urged before the commission shall not be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

■ There is a basic inconsistency in Commission's posture. On the one hand it defends an ambiguous, undetailed complaint suggesting no specific relief. On the other hand it contends § 105A.10(4) must be strictly construed and respondents at their peril must clearly define their defenses in the preliminary stages. We hold the nature of this complaint, and the manner of its drafting and execution is an extraordinary circumstance which excused the respondents in their failure to raise this objection at Commission hearing. Evidently trial court reached the same conclusion, as the objection was considered when the case was reviewed there.

■ Under the language of this legislation, a complaint may be initiated by persons other than one aggrieved by a discriminatory or unfair practice. The Commission, a commissioner or the attorney general may file a complaint (§ 105A.9(1)). An employer is specifically empowered to file complaint when its employees refuse or threaten to refuse to comply with the provisions of chapter 105A (105A.9(2)). The complaint's main function is to trigger Commission investigation and, if probable cause is found, conference, conciliation and persuasion will follow. The agency decides if litigation is necessary. Complainant's importance as an adversary party is not established by the statutory provisions. We hold strict procedural rules in this area are not applicable. We do not imply we hold procedural rules, made necessary by due process and fair play, have no application to Commission proceedings. As bearing on this point, see Hoenig v. Mason & Hanger, Inc., 162 N.W.2d 188 (Iowa 1968).

Further, though Hart's signature is not accompanied by his title at the end of the

complaint, he is affirmatively identified in his capacity as vice-president of Weitz at the outset of the instrument. The address given is the company's. Trial court found complaint was initiated by Mr. Hart on behalf of Weitz. Enough loss and damage was sustained by Weitz as a result of respondents' conduct to permit it to fall within the legal definition of "aggrieved person." American Surety Co. v. Jones, 384 Ill. 222, 51 N.E.2d 122 (1943); In re Vetter's Estate, 139 Neb. 307, 297 N.W. 554 (1941).

We find no merit in respondents' first proposition relied upon for reversal.

II. *Commission's authority to render judgment for compensatory damages.*

■ The complaint filed by Weitz makes no mention of monetary injury or damage to that company. There is nothing in chapter 105A which would have alerted respondents' counsel he was in the trial of an action for common law damages. The limited evidence in the record came in by way of reference to a rejected claim "against the Postal Department." "Exhibit A", admitted into evidence, is the same itemization of claimed damage set out above. Although this chapter provides Commission shall not be bound by strict rules of evidence (§ 105A.9(11)); there is a question whether the testimony on this point rises to the dignity of evidence at all. No one ever explained how the overhead "loss" was computed, nor did anyone testify the charges incorporated in the claim were fair and reasonable. The experienced trial counsel for respondents obviously did not understand he was trying a damage case: he objected this testimony was immaterial.

We mention these circumstances to demonstrate the unsatisfactory nature of the statutes creating the Commission and its procedures if viewed as a vehicle to litigate questions of compensatory damages. Nor do we believe this was the legislature's intent.

Section 105A.9(12) gives the Commission, if it finds respondent engaging in an unfair or discriminatory practice, tools to eliminate such practice. One tool is prohibitive action—Commission may order respondent to cease and desist. The other tool is to direct "affirmative action" to correct the condition—reinstatement, reemployment, and other such measures. The unfair practice shown here, within the language of the complaint, was making members of the negro race feel unwelcome, objectionable and not acceptable for membership in Local 67. The Commission decreed both prohibitive and affirmative action with respect to this problem. As it bore on the correction of the specific objectionable practice, Commission's order, as modified, was within the statute although it unquestionably probed the perimeter of authority granted by this legislation. But Commission also attempted to fix damages in a collateral matter for a corporation which had not been discriminated against because of its race, creed, color, sex, national origin or religion. In this, Commission clearly exceeded its statutory authority. A judgment for the employer does not affirmatively make negroes more welcome in Local 67.

The right granted Commission to allow back pay for employees ordered hired, reinstated or upgraded is only incidental to affirmative action equitably decreed and cannot by analogy generate a power to enter judgment for other common law damages. If the legislature had intended to constitute Commission as an additional court for adjudicating damages it would have so stated. Our reasoning is further buttressed by § 105A.9 which provides the *court* shall fix actual *damages* of a respondent where there was no reasonable cause to believe the ground upon which the complaint was made.

The vast majority of states which have adopted anti-discrimination legislation have not expressly provided for awarding compensatory damages in cases involving unfair employment practices. Minnesota

(Minn.Stat.Ann. §§ 363.01–363.13 (1957)) and New York (N.Y. Executive Law §§ 290–301 (McKinney's Consol.Laws, c. 18, Supp.1970)) are exceptions, as is New Mexico (N.M.Stat. ch. 4, Art. 33, §§ 4–33–1 to 4–33–13 (Supp.1969)), where the amount is limited to "actual damages" in an amount not to exceed $1000.00.

Commission argues if a discriminating respondent is not made to pay damages caused, the purposes of chapter 105A cannot as a practical matter be effectuated. We are not so convinced. The Commission, armed with broad statutory powers to enjoin and to compel affirmative action to eliminate discriminatory practices may surely fashion a remedy without resort to issues courts are better adapted to litigate.

█ Of course, the damaged person continues to have his remedy in civil court, Amos v. Prom, Inc., 117 F.Supp. 615, 620–621 (N.D.Iowa 1954); Humburd v. Crawford, 128 Iowa 743, 105 N.W. 330 (1905).

We hold Commission has no authority under § 105A.9(12) to enter judgment for compensatory damages per se. Accordingly, we reverse district court's decree insofar as it requires Local 67 to pay Weitz the sum of $1033.50.

III. *Commission decision as not being in accord with the complaint and the evidence.*

Local 67 and Reed assert the decree below was outside the scope of the complaint filed and not warranted by the evidence. We have agreed with these respondents to the extent of the award of damages, in Division II hereof.

The other portions of the order as modified are, we hold, within the ambit of the complaint and statutory authorization. If this were an action between private litigants in civil court respondents' position might be well taken. Rule 70, R.C.P. provides the petition shall state whether it is at law or in equity, the facts constituting the cause or causes of action asserted, the relief demanded, and, if for money, the amount thereof. This court has often held it to be error to award relief which has no foundation in the petition or is not justified by the evidence. State Board of Social Welfare v. Teeters, 258 Iowa 1113, 141 N.W.2d 581 (1966); Paintin v. Paintin, 241 Iowa 411, 41 N.W.2d 27 (1950); Bennett v. Greenwalt, 226 Iowa 1113, 286 N.W. 722 (1939).

We have before us, however, an administrative proceeding foundationed upon a legislative enactment designed more to implement broad public policy than to adjudicate differences between private parties. We have held technical rules of pleading have no application in an administrative proceeding. Coghlan v. Quinn Wire & Iron Works, 164 N.W.2d 848 (Iowa 1969). In Hoenig v. Mason & Hanger, Inc., 162 N.W.2d 188, at page 192 (Iowa 1968) we said, "the key to pleading in an administrative process is nothing more nor less than opportunity to prepare and defend. And deficiencies in any pleading in that field may be cured by a motion for more specific statement". See also Douds v. International Longshoremen's Ass'n, 241 F.2d 278, 283 (2d Cir. 1957); 1 Davis, Administrative Law § 8.04, p. 525 (1958).

In analyzing the proper role of the complaint under the federal act, which is similar in terms, the United States Court of Appeals for the fifth circuit has said in Jenkins v. United Gas Corporation, 400 F.2d 28, 30 n. 3 (1968):

"For a lay-initiated proceeding it would be out of keeping with the Act to import common-law pleading niceties to this 'charge,' or in turn to hog-tie the subsequent law suit to any such concepts. All that is required is that it give sufficient information to enable EEOC to see what the grievance is about. See United States v. Mayton, 5 Cir., 1964, 335 F.2d 153, 160–61."

This type of complaint was not designed for the sophisticated or the cognoscenti,

but to protect equality of opportunity among all employees and prospective employees. This protection must be extended to even the most unsophisticated and inarticulate. Sanchez v. Standard Brands, Inc., 431 F.2d 455, 463 (5 Cir. 1970).

> "The functions of administrative agencies and courts are so different that the rules governing judicial proceedings are not ordinarily applicable to administrative agencies unless made so by statute."
> —1 Davis, Administrative Law § 8.03, p. 522 (1958).

■ Here the complaint arguably satisfied the minimum requirements of the statute (§ 105A.9(1)). Respondent, wanting the particulars set out more specifically, could have made appropriate motion. The Commission hearing which started on January 22, 1970 was reopened on March 26, 1970 at request of complainant and again reopened on April 30, 1970 at request of respondents. While the statute provided for motion to remand from district court to Commission for additional evidence (§ 105A.10(5)) and for additional evidence in district court (§ 105A.10(6)) respondents did not avail themselves of such opportunities. By that stage of the proceedings, respondents surely knew the basic issues.

■ We are aware this court has held the prayer of a pleading necessarily measures the recovery that may be awarded. Stromberg v. Crowl, 257 Iowa 348, 132 N.W.2d 462 (1965); Rauch v. Senecal, 253 Iowa 487, 112 N.W.2d 886 (1962). We do not believe that rule is mandatory in all administrative proceedings. Chapter 105A does not require the complaint to state the relief sought. Such relief is to be fashioned by the Commission, after hearing and finding of unfair practice, within the framework of the statute and constitutional safeguards.

Turning to the question whether the evidence justified the decision below, we observe parenthetically complainants' evidence of pattern discrimination was not of that quality which makes an appellate court's work simple. For examples of painstaking efforts to build a proper record of discrimination see United States v. Sheet Metal Wkrs. International Ass'n, Local U. No. 36, 416 F.2d 123 (8 Cir. 1969) and United States v. Local No. 86, International Ass'n of Bridge, S., O. & R. I., 315 F.Supp. 1202 (W.D.Wash.1970).

There is testimony in the record, however, indicating Reed's knowledge of union sentiment against having black members. The "blu flu" sick-out of Local 67 journeymen when Roe appeared on the post office job site, uncontroverted in the evidence, speaks with a force which cannot be quieted. The union men did not know Roe: they only knew he was black. Other testimony of "hostility" and discouragement of negroes is convincing.

■ According to the 1970 census, there are over 11,000 blacks in Des Moines. We may take judicial notice of these statistics. In re Primary Road No. Iowa 141, 255 Iowa 711, 124 N.W.2d 141 (1963). Of the 309 Local 67 members, only two are black and these are "fence erectors", a separate category. In racial discrimination cases, statistics often demonstrate more than the testimony of many witnesses, and should be given proper effect by the courts. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10 Cir. 1970). We appreciate, as did the federal court in Equal Emp. Op. Com'n v. United Ass'n of J. & A. of PL., L.U. No. 189, 311 F.Supp. 468, 472 (S.D. Ohio 1970), such statistics are more valid in voting and education cases than in the case at bar where Commission made no attempt to prove a qualified pool of non-member black steelworkers. However, we cannot reasonably believe only one negro would apply for permit or apprentice training in the almost 60 years of this union's history prior to April 1969, unless blacks were being subjected to discrimination, however invidious. Of the four negroes who testified for respondents, one had worked on permit only for three years;

the other three were issued permits after complaint was filed.

■ We hold Commission and district court were right in finding Local 67 and Reed in violation of 105A.7(1) (c), by indicating to blacks they were unwelcome, objectionable and not acceptable for membership.

■ Therefore, Commission was authorized to enjoin such behavior, which it did, and to order such affirmative action "as in the judgment of the commission shall effectuate the purposes of this chapter" (§ 105A.9(12)). A purpose of chapter 105A as stated in its full title is " * * * to eliminate unfair and discriminatory practices in * * * employment, apprenticeship programs * * *". The court in applying (interpreting) a civil rights statute will effectuate the legislative purpose and design as the court finds them expressed by the language and spirit of the statute. Burke v. Rosenthal, 27 Conn.Super. 141, 232 A.2d 508, 511 (1967); 14 C. J.S., Civil Rights § 3, p. 1163; 3 Sutherland, Statutory Construction § 6604, pp. 282–289 (3d ed.).

■ In attacking the affirmative portions of this order, respondents make two erroneous assumptions. The first is that the proceeding resulting in the decree was required to be as procedurally precise as the usual civil proceeding. This assumption has been laid to rest. The second erroneous assumption is, the legislation involved must be interpreted as affording merely a remedy in a specific dispute rather than correcting a broader pattern of behavior. It is the latter goal toward which this legislation is directed.

It was the *practice of discrimination*, not merely the humiliating treatment of Roe, at which the Commission and trial court took aim in this decree. The genesis of the affirmative conduct ordered by Commission and district court may be found in United States v. Local No. 86, International al Ass'n of Bridge, S., O. & R. I., 315 F.Supp. 1202 (W.D.Wash.1970); United States v. International Longshoremen's Ass'n, 319 F.Supp. 737 (D.Md.1970); Local 53 of International Ass'n of Heat & Frost I. & A. Wkrs. v. Vogler, 407 F.2d 1047 (5 Cir. 1969); Clark v. American Marine Corporation, 304 F.Supp. 603 (E.D. La.1969); Arnett v. Seattle General Hospital, 65 Wash.2d 22, 395 P.2d 503 (1964). Counsel for respondents undoubtedly had knowledge of these typical remedies at time of hearing before Commission.

■ A nondiscriminatory inclusion of blacks in union's work permit and apprenticeship programs should provide impact in dislodging rigid patterns of past discrimination. There is no such thing as an "instant iron worker"—by court decree or otherwise. See Dobbins v. Local 212, International Bro. of Elec. Wkrs., 292 F. Supp. 413, 445 n. 15 (S.D.Ohio 1968). Union's obligation to contact members of minority groups is appropriate to insure the elimination of the effects of the past. Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); Local 53 of International Ass'n of Heat & Frost I. & A. Wkrs. v. Vogler, 407 F.2d 1047, 1052–1053 (5 Cir. 1969); United States by Mitchell v. United Ass'n of Journ. & App. of P. & P.F.I., 314 F.Supp. 160, 166 (S.D. Ind.1969). These provisions of the decree are reasonable steps to be taken to inform minority community that all persons are now treated equally by Local 67 with respect to race, color or creed. United States v. Sheet Metal Wkrs., International Ass'n, Local U. No. 36, 416 F.2d 123, 133, 139–140 (8 Cir. 1969). Mandatory records and reports, authorized by § 105A.9(12), reasonably insure compliance with the decree. United States v. Local No. 86, International Ass'n of Bridge, S., O. & R.I., 315 F.Supp. 1202, 1251–1252 (W.D.Wash. 1970); United States by Mitchell v. United Ass'n of Journ. & App. of P. & P.F.I., 314 F.Supp. 160, 167 (S.D.Ind.1969); Holland v. Edwards, 307 N.Y. 38, 119 N.E.2d 581, 44 A.L.R.2d 1130 (1954).

An appropriate remedial order should also close off "untraveled roads" to the illicit end and not "only the worn one". Dobbins v. Local 212, International Bro. of Elec. Wkrs., 292 F.Supp. 413, 447 (S.D. Ohio 1968). The inadequacy of broad and general testing devices as well as the infirmity of using diplomas or degrees as fixed measures of capability has been judicially noted, together with their capacity for subtle discrimination. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In this context, we find those portions of the decree relating to union testing devices permissible under chapter 105A.

We said in Division I and reiterate here, under this record these affirmative remedies probe the permissible periphery of Commission's statutory and constitutional authority. It remains only to be said the orders provided in the decree are to be used as a shield to guard against minority discrimination, not as a sword to inflict discrimination on the white majority. All races, majority or minority, are protected from unfair employment practices under § 105A.7.

We find respondents' third proposition relied on for reversal to be without merit.

IV. *Section 105A.7(1) (c) as being void for vagueness; and § 105A.9(12) as being void as an improper delegation of legislative powers.*

Respondents' last proposition asserts the two vital statutes set out at the beginning of this opinion are unconstitutional.

We have said a statute will not be declared unconstitutional unless it clearly, palpably and without doubt infringes the constitution. Every reasonable doubt will be resolved in favor of constitutionality. Lee Enterprises, Inc. v. Iowa State Tax Com'n, 162 N.W.2d 730, 737 (Iowa 1968); Danner v. Hass, 257 Iowa 654, 661, 134 N. W.2d 534, 539 (1965). A constitutional challenge must specify constitutional provisions invoked and state with precision the details of a claimed defect. Frost v. State, 172 N.W.2d 575 (Iowa 1969); Buda v. Fulton, 261 Iowa 981, 157 N.W.2d 336 (1968).

Respondents' challenges to the constitutionality of these statutes might be rejected on the basis of these guidelines. They do not allege what provisions of the constitution are offended nor even which constitution is invoked. Presumably when respondents allege § 105A.7(1) (c) is void for vagueness reference is being made to the due process clauses, U.S.Const. Amend. 14; Iowa Const. art. I, § 9.

Respondents claim this section attempts to control private actions of individuals. They make an unconnected reference to Amendment 9, U. S. Constitution, "The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people". Amendment 9 was neither raised at the hearing nor argued and applied in this appeal. We recognize respondent Local 67 as a labor union N.L.R.B. certified as bargaining agent for iron workers, not a social club. Respondent Reed is before this court as business manager of this union, in his official capacity. Social conduct and feelings manifested in discriminatory employment practices are and have been subject to legislative action. Railway Mail Ass'n v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945); Waters v. Wisconsin Steel Wks. of Internat'l Harvester Co., 427 F.2d 476 (7 Cir. 1970), cert. denied, 400 U.S. 911 (1970); United States v. International Longshoremen's Ass'n, 319 F. Supp. 737 (D.Md.1970).

Confusion existing in this area of the law is complicated by a failure to draw an important distinction. "Civil rights" should be regarded as enforceable claims, structured in legislation. "Civil liberties" are immunities—restraints on government—protected by constitutional provisions. The first requires involvement by governmental units; the second calls for

indispensable restraint. The balance between civil rights and civil liberties must be weighed carefully. Sowers v. Ohio Civil Rights Commission, 20 Ohio Misc. 115, 252 N.E.2d 463 (1969).

Action of a civil rights commission may impermissibly violate a respondent's civil liberties, constitutionally guaranteed, even though the civil rights legislation is constitutional. Commission and reviewing courts must walk a careful line between civil rights enforcement and infringement of civil liberties. Sowers v. Ohio Civil Rights Commission, 20 Ohio Misc. 115, 252 N.E.2d 463 (1969). However, the caution required in applying chapter 105A does not render it unconstitutional.

The language used in § 105A.7(1) (c) meets the constitutional test if its meaning is fairly ascertainable by reference to similar statutes, other judicial determinations and reference to the dictionary, or if the words themselves have a common and generally accepted meaning. Powers v. McCullough, 258 Iowa 738, 746, 140 N.W.2d 378, 384 (1966); Diamond Auto Sales, Inc. v. Erbe, 251 Iowa 1330, 1341, 105 N.W.2d 650, 656 (1960). This court has no power to determine whether legislative acts are wise or unwise. State ex rel. Fulton v. Scheetz, 166 N.W.2d 874, 878 (Iowa 1969); Green v. City of Mt. Pleasant, 256 Iowa 1184, 1196, 131 N.W.2d 5, 13 (1964). The provisions of § 105A.-7(1) (c) are not so vague and uncertain as to render that statute unconstitutional.

Respondents also challenge the constitutionality of the second vital section, 105A.-9(12), relating to Commission's right to formulate a remedy to eliminate a discrimination practice. It is alleged the act is an unconstitutional delegation of legislative power. While respondents do not point out the specific constitutional provision, we assume it is Iowa Constitution art. III § 1, establishing three separate departments of government.

There is no potential defect under the federal constitution. That constitution proscribes only a delegation of federal power. A state legislature is not prohibited by federal constitution from delegating its power to a state agency. Gold v. Lomenzo, 304 F.Supp. 3 (S.D.N.Y.1969); 1 Davis, Administrative Law § 214, p. 146 n. 41 (1958).

On the question of power delegation we recently held the important consideration is not whether the statute delegating the power expresses precise standards but whether the procedure established for the exercise of power furnishes adequate safeguards for those affected by the administrative action. Elk Run Telephone Co. v. General Telephone Co., 160 N.W.2d 311 (Iowa 1968); see also State v. Watts, 186 N.W.2d 611 (Iowa 1971). Sections 105A.9 and 105A.10 are replete with safeguards protecting respondent. There is notice of complaint, and provision for conciliation. Opportunity to answer is afforded. Notice of time and place of hearing is given, at which hearing respondent may appear in person, with or without counsel, and submit testimony. Complainant has burden of proof, not the respondent. The latter has right of cross-examination and testimony is reported. A copy of the Commission transcript is available without charge. He may take de novo appeal to district court and may request opportunity to submit additional evidence. Thereafter respondent may appeal to this court. Chapter 105A provides adequate safeguards on administrative procedures. Section 105A.9(12) is not unconstitutional under doctrine of undue delegation.

Though we find adequate safeguards provided by chapter 105A any doubts would be assuaged with detailed statement of agency rules and regulations. Apparently, however, Commission has been activated for over five years without exercising its rule making power (§§ 105A.9(14), 105A.5(9), 105A.9(1)) to implement or extend the skeletal procedural provisions of §

105A.9. It has adopted only two regulations, both relating to sex-segregated want ads (Iowa Departmental Rules 1971). Attention to this area would assist future respondents, particularly in absence of a state administrative procedure act.

In holding delegation of legislative power contained in § 105A.9(12) constitutional we follow other courts interpreting similar legislation. See Railway Mail Ass'n v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945) (construing New York civil rights law); Motorola, Inc. v. Illinois Fair Employ. Prac. Com'n, 34 Ill.2d 266, 215 N. E.2d 286 (1966) (delegation of power held constitutional, commission's action held unjustified by evidence); Massachusetts Com'n Against Discrim. v. Colangelo, 344 Mass. 387, 182 N.E.2d 595 (1962) (fair housing practices law held constitutional); City of Highland Park v. Fair Employment Prac. Com'n, 364 Mich. 508, 111 N. W.2d 797 (1961) (fair employment practices statute held constitutional); Sowers v. Ohio Civil Rights Commission, 20 Ohio Misc. 115, 252 N.E.2d 463 (1969) (civil rights act declared constitutional, grant of authority to commission held abused); Weiner v. Cuyahoga Community College District, 15 Ohio Misc. 289, 238 N.E.2d 839 (1968) ("The court is satisfied that The Civil Rights Act of 1964, Title VII, is constitutional") aff'd on other grounds 48 Ohio Op. 48, 19 Ohio St.2d 35, 249 N.E.2d 907 (1969); *contra* Colorado Anti-Discrimination Commission v. Case, 151 Colo. 235, 380 P.2d 34 (1963) (Colorado fair housing act held unconstitutional, in part, under undue delegation of power doctrine).

The test applied by this court is, the challenging party has the burden of establishing the legislation is unconstitutional and must negative every reasonable basis which might sustain the statute. Lee Enterprises, Inc. v. Iowa State Tax Com'n, 162 N.W.2d 730 (Iowa 1968). Measured by this test, the issues raised by respondents in this litigation neither meet the burden nor negative every reasonable basis to sustain this legislation. In the posture

presented here, we find § 105A.7(1) (c) and § 105A.9(12) constitutional.

All propositions presented by respondents have been considered. In conformance with the above opinion the case is—

Affirmed in part; reversed in part.

All Justices concur.