NEWSWEEK MAGAZINE, Newsweek—
Washington Bureau, Mel
Elfin, Petitioners,

v.

DISTRICT OF COLUMBIA COMMIS-
SION ON HUMAN RIGHTS,
Respondent,

Samuel F. Yette, Intervenor.

No. 8228.

District of Columbia Court of Appeals.

Argued Feb. 20, 1975.

Decided March 28, 1977.

Reargued April 11, 1977.

Rehearing En Banc Denied Aug. 8, 1977.

Richard M. Cooper, Washington, D. C., was on the brief, for petitioners.

C. Francis Murphy, Corp. Counsel, Washington, D. C., at the time the brief was filed, Louis P. Robbins, Principal Asst. Corp. Counsel, Richard W. Barton and Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., were on the brief, for respondent.

James A. Dobkin, Washington, D. C., with whom Clifford L. Alexander, Jr., and Paul S. Ryerson, Washington, D. C., were on the brief and on the petition, for intervenor.

Edward Bennett Williams, Washington, D. C. (on brief), with whom Harold Ungar, Washington, D. C., was on the opposition, for petitioners.

Before FICKLING,* GALLAGHER and YEAGLEY, Associate Judges.

YEAGLEY, Associate Judge:

Petitioners seek reversal of a decision of the respondent District of Columbia Commission on Human Rights (hereinafter the Commission) awarding complainant Samuel F. Yette $1,000 damages and $20,000 attorneys fees for alleged acts of racial discrimination assertedly perpetrated on him by Newsweek Magazine, his employer, and Mel Elfin, the Washington Bureau Chief. Petitioners also urge this court to overturn the Commission's order requiring the magazine to establish and maintain in its Washington office an affirmative action program and to make regular reports on that program to the Office of Human Rights. In particular, petitioners contend that the Commission's findings were legally insufficient and that the evidence adduced at the hearing did not support the charges made. In addition, they assert that the statutory provision under which the Commission acted, Title 34 of the D.C. Rules and Regulations, was not available for relief in this proceeding since it was not adopted until well after the hearing herein was concluded and the briefs had been submitted. Thus, petitioners argue that D.C. Police Regulation Article 47 was the only provision under which the Commission could validly act, and since this did not provide for the awarding of damages or attorneys fees, or an affirmative action order, a reversal is warranted. We agree with petitioners and therefore reverse the decision of the Commission.

On or about January 5, 1972, a few months after his discharge from Newsweek, Mr. Yette filed a complaint with the District of Columbia Office of Human Rights alleging racial discrimination in violation of D.C.Pol.Reg. Art. 47, § 4(a), relating to the conditions of his employment and the cause of his termination at Newsweek. Specifically he alleged that his superiors at the magazine used "derogatory epithets, adversely affecting the conditions of [his] employment." In addition to this name-calling, which he termed racially motivated, he complained of racially derogatory jokes, negative reaction to the publication of a book he had written while working at the magazine, and "incipient racism" in his discharge in which "competency was not an issue". Newsweek denied the charges and presented testimony that during all the years he worked at Newsweek, Mr. Yette never made any charge of racism to any of his colleagues or to any of the editors in Washington or New York. Though Bureau Chief Mel Elfin was specifically named a respondent in the complaint, petitioners pointed out that Mr. Yette did not directly accuse him of racial discrimination until the day of his termination nor did he mention any racial difficulties whatever to other black or white colleagues on the magazine. Newsweek accordingly asserted that the charge of racial discrimination was concocted only after his dismissal in an effort to explain his termination from employment which the employer attributed to substandard performance.

The evidence adduced at the hearing revealed that Mr. Yette, a well-known black reporter, was hired by Newsweek in January 1968, as a correspondent in its Washington Bureau. Though Mr. Yette did not have prior experience at Newsweek or in Washington reporting, two qualifications that are required normally for a reporter in the Washington Bureau, he had held various jobs both as a reporter on newspapers and, more recently, as an executive in the Peace Corps and in the Public Affairs and Public Information Office of the Office of Economic Opportunity. The chief of the Washington Bureau, Mr. Mel Elfin, thought that this experience would be sufficient to meet the reporting requirements of Newsweek and thus Mr. Yette was hired.

The testimony at the hearing before the Commission was conflicting regarding the complainant's performance during more

* Associate Judge Fickling participated at argument and in postargument discussions but died March 6, 1977.

than three years of employment at Newsweek. Mr. Yette testified that from the very beginning he was highly complimented for his skillful work and that these commendations continued throughout his employment at the magazine. He said that the many speeches he gave to outside groups and his numerous appearances on television news programs were evidence of the high esteem in which he was held by his colleagues. Despite those assertions as to the respect petitioners had for the quality of his work, however, Mr. Yette added he was kept by Newsweek on "general assignment" throughout his tenure at the magazine, frequently being used merely as a back-up reporter for others on the Washington staff and more often than not assigned to cover stories relating to his race.

In addition to his work on what he felt was the demeaning general assignment, Mr. Yette asserted that he was the victim of discrimination when he was addressed by one of his supervisors with what he considered to be racially dehumanizing nicknames. Furthermore, he contended he was subjected to listening to racially insulting jokes told in his presence. This treatment he asserted would have been offensive to any black person, especially one of Mr. Yette's background, experience and sensitivity.

These alleged events occurred against the background of an employment situation in Newsweek's Washington Bureau which Mr. Yette characterized as consisting of "few black employees and a lack of any serious efforts to explore the reasons for the deficiency or to correct it." However, he made no complaint or charge of discrimination until the meeting with his superiors regarding his termination.

Newsweek, on the other hand, produced many witnesses to refute these allegations or explain their context or significance. Basically it contended that Mr. Yette was fired because of his poor performance and inability to adjust to the unusual Newsweek style [1] and produced testimony from some of its editors and officers to support its position. The complainant presented witnesses who testified to his reputation as a journalist but offered no witnesses other than himself to testify either to acts of discrimination, or the quality of his work at Newsweek.

The Commission's findings and comments on the complainant's testimony are set forth in its decision pages one through six. (The decision of the Commission is set forth in full in an appendix to this opinion.) Very little of the defense testimony, some of it uncontradicted, has been the subject of findings or comment by the Commission. In view of the assertions of petitioners on appeal regarding deficiencies in the findings and the failure to treat with most of the testimony offered by petitioners, we examine the evidence adduced at the hearing in further detail.

The magazine produced evidence that Mr. Yette was hired as the result of two separate and parallel initiatives by Newsweek. This was seemingly part of an ongoing affirmative program to recruit black reporters. Newsweek asserted that almost from the beginning, after he was hired, Mr. Yette did not measure up to the magazine's rather strict standards of performance and because of his personal attitudes and qualities Mr. Yette could not participate adequately in group journalism. In addition, according to the testimony of many of his supervisors and fellow workers on the magazine, Mr. Yette was highly resistant to

1. According to Newsweek witnesses, its news reporting is divided into two separate functions: news gathering, carried out by reporters stationed in bureaus throughout the world, and news writing and editing, carried out by writers and editors stationed in New York. A Newsweek reporter is expected to gather and investigate the facts of a particular story to provide the basic materials needed to prepare an article. These materials make up a file. Ideally, a good Newsweek file is one which provides all the facts, quotations, and colorful details needed by the writers and editors to produce a good story, and which provides that data accurately, coherently, fairly, with good judgment, briefly, and on time. In other words, the article or material supplied by the reporter in the field was always rewritten and did not appear in the form it was submitted.

criticism of his work, seeing no need for instruction or guidance from anyone and he viewed editing of his work product as "desecration" and regarded himself as more competent than his more experienced colleagues.

Mr. Elfin said he received criticism of Mr. Yette's files from the editors in New York. Beginning in 1968, and increasingly during 1969 and 1970, several editors requested that Mr. Yette not be assigned to stories for their sections of the magazine. Mr. Elfin testified that he attempted to work with Mr. Yette but his files did not improve. In addition there was testimony that Mr. Yette consistently violated the office rule that each morning reporters should appear at the office in person or inform the bureau chief of their whereabouts. Thus it was said to be difficult to give Mr. Yette new assignments.[2] These absences from work increased during late 1970 and early 1971 and coincided with the final preparation of a book he was writing entitled, *The Choice: Issues of Black Survival in America*, which was published in February 1971.

The book became a point of dispute before the Commission. Mr. Yette asserted that this book, which he said "revealed a black man's perception and opinion of the plight of his brothers" and which "asserted his black heritage—with pride", resulted in increasing criticism from New York. He said that Mr. Elfin told him that "the book had been an embarrassment to him personally and to the company in general", and that shortly thereafter Newsweek terminated his employment.

Newsweek, on the other hand, produced uncontradicted testimony that it never hindered Mr. Yette in either writing or publicizing the book. Indeed, Mr. Yette himself testified that when he first informed his supervisors that he was writing a book, he was given a chance to take time off to work on it. Mr. Yette's supervisors at Newsweek allowed him to make 16 speeches

throughout the country publicizing the book. In each appearance Newsweek was linked with the book and, for each, Mr. Yette's expenses were paid for by the magazine. In addition, in 15 out of the 16 speeches Newsweek paid him an honorarium.

However, according to the evidence Mr. Yette's quality of work at the magazine continued to slide. By April 1971, his area of regular coverage was reduced to the field of education and his repeated absences from work were causing considerable difficulties. A meeting was held in April 1971, at which time Mr. Elfin suggested to Mr. Yette that he ponder seriously his future at Newsweek since his work had not been satisfactory. In July of 1971, the education editor (the one editor willing to accept Mr. Yette's work) informed Mr. Elfin that he preferred someone else to be assigned a particular education story. Mr. Elfin said he then realized that there was very little for Mr. Yette to do at Newsweek and shortly thereafter he was discharged. This discharge was later rescinded and Newsweek offered to transfer Mr. Yette to another bureau and protect him from any financial loss resulting from the transfer but he refused and his discharge became final.

## I.

In view of the issues raised, we examine next the authority under which the Commission acted.

The Police Regulation under which the complaint was filed was enacted pursuant to the authority in D.C.Code 1961, § 1–226,[3] which provided that:

The Commissioners of the District of Columbia are hereby authorized and empowered to make and enforce all such reasonable and usual police regulations . . . as they may deem necessary for the protection of lives, limbs, health, com-

---

2. No findings were made on the defense evidence regarding Mr. Yette's performance or the magazine's reasons for terminating him nor did the Commission find that those witnesses were not credible.

3. The same authority is presently given the District of Columbia Council by D.C.Code 1973, § 1–226.

fort and quiet of all persons and the protection of all property within the District of Columbia.

■ The legislative authority of the Commissioners was limited to the enactment of "reasonable and usual police regulations." *Mendota Apartments v. District of Columbia Commission on Human Rights*, D.C.App., 315 A.2d 832, 834 (1974). *See District of Columbia v. John R. Thompson Co., Inc.*, 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953); *Filippo v. Real Estate Commission of District of Columbia*, D.C. App., 223 A.2d 268 (1966); *Firemen's Insurance Co. v. Washington*, 157 U.S.App.D.C. 320, 483 F.2d 1323 (1973); *Maryland & District of Columbia Rifle & Pistol Ass'n, Inc. v. Washington*, 142 U.S.App.D.C. 375, 442 F.2d 123 (1971).

■ The immediate question is whether the prohibition by the Commissioners of racial discrimination in employment is a "reasonable and usual" Police Regulation. We conclude it is. We note in this connection that this court in *Mendota Apartments v. District of Columbia Commission on Human Rights, supra,* applied D.C.Pol.Reg. Art. 45, dealing with discrimination in housing as a valid Police Regulation. Authority for the adoption of housing regulations dealing with illegal discrimination can be inferred from the statutory language of § 1–226 providing for the promulgation of "reasonable and usual" regulations for the "protection of all property" within the city. It is quite another matter to say that a regulation against illegal discrimination in employment comes within this statutory authorization from Congress. It is not specifically provided for in direct terms. However, we view the harmful effects of illegal discrimination in employment to be so deleterious to our society as to affect the "lives, limbs, health, comfort and quiet of all persons" within the District and thus within the purview of § 1–226's language of "reasonable and usual" Police Regulations. Accordingly we hold the regulation to be within the scope of D.C.Code 1961, § 1–226 and a proper exercise of the Commissioners' power. This in effect was our ruling sub silentio analyzing D.C.Pol.Reg. Art. 47 in *Communications Workers of America, AFL–CIO v. District of Columbia Commission on Human Rights*, D.C.App., 367 A.2d 149 (1976).

■ On November 17, 1973, some seven months after the hearing was concluded but prior to the December 5, 1973 decision in this case, the City Council passed the Human Rights Law, known as Title 34. That law, like D.C.Pol.Reg. Art. 47 was enacted as a Police Regulation pursuant to D.C.Code 1973, § 1–226. *See* 34 DCRR at 1 and 34 DCRR § 1.3.[4]

■ Although we recognize that illegal discrimination in employment may be the subject of a Police Regulation, we point out that this court recently concluded in *Communications Workers of America, AFL–CIO v. District of Columbia Commission on Human Rights, supra,* that an award of monetary damages and counsel fees, as done here, is not authorized by Article 47. The article provided only for the Council on Human Rights, now the Commission, to make "recommendations for correction of the illegal practice, with notice that if said illegal employment practice is not corrected within fifteen (15) calendar days of the service of said conclusion and recommendations, the Council will refer the matter to the Corporation Counsel for enforcement."[5]

---

**4.** Insofar as Title 34 may be applicable to this proceeding, we consider it, like Article 47, a valid exercise of the police power. *See, e. g., City of St. Louis v. Missouri Comm'n on Human Rights*, 517 S.W.2d 65, 70 (Mo.1974); and *Sowers v. Ohio Civil Rights Comm'n*, 20 Ohio Misc. 115, 252 N.E.2d 463, 479 (Ohio Com. Pleas 1969). *See also Communications Workers of America, AFL–CIO v. District of Columbia Comm'n on Human Rights, supra* at 153–54. Under Title 34, respondent Commission

was known as the Commissioner's Council on Human Rights.

**5.** D.C.Pol.Reg. Art. 47, § 9(b). We note that this court in *Mendota Apts. v. District of Columbia Comm'n on Human Rights, supra,* discussed the matter to a limited extent by saying as to § 9(b) of Article 45 that: "Whether a reasonable and usual police regulation may authorize an administrative body to award unliquidated damages is at the least doubtful." 315 A.2d 835.

Accordingly the award of damages and attorneys fees cannot be upheld under the authority of Article 47.

Respondent Commission and intervenor Yette urge us to uphold the Commission's award of damages and attorneys fees on the basis of the new provisions of Title 34.

■ As we have indicated the intervenor filed his complaint under Article 47 in January 1972, and the case was tried under the provisions of that regulation. It was not until after the hearings in this matter were concluded and the briefs submitted that Title 34 was adopted. Such legislation is not to be applied retroactively except perhaps where "the words [of the new legislation] are so clear, strong and imperative that no other meaning can be annexed to them." *United States Fidelity & Guaranty Co. v. United States for use and benefit of Struthers Wells Co.,* 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908); *accord, International Brotherhood of Boilermakers v. NLRB,* 114 U.S.App.D.C. 372, 374, 316 F.2d 373, 375 (1963). As the court said in the latter case, "[t]here is no such language or clearly manifested intent here." *Id.* (footnote omitted). When a similar position was taken by the Commission in *Communications Workers of America, AFL–CIO v. District of Columbia Commission on Human Rights, supra,* we said:

> Our reading of the Council's Regulation as requiring *prospective* application is consistent with a further proviso in the Council's Regulation No. 73–22 calling for the development and then submission to the Council of "guidelines . . . with regard to compensatory damages and attorneys fees." 34 DCRR § 33.4(a). Accordingly, we conclude in the instant case that (1) the award of monetary damages and counsel fees and (2) the order to adopt an affirmative action plan were, under the circumstances here, beyond the authority of the Commission to order. [367 A.2d at 154 (footnote omitted).]

Further, the intent clearly manifested in the regulation is quite contrary to a retroactive application.

The Council provided in "A Regulation Governing Human Rights—Title 34", on November 17, 1973:

> *Section 1.* Articles 40, 45, and 47 of the Police Regulations of the District of Columbia are hereby repealed; except that any proceedings instituted under such regulations, or any violations of such regulations which occurred prior to the effective date of this Title, shall not be nullified by the adoption of this Title. Any regulations superseded by the provisions of this Title, shall remain in full force and effect for the purpose of any criminal prosecution, civil litigation, or administrative proceeding pending at the effective date of this Title; or which may be instituted after such effective date, as a result of any act, omission, or violation thereunder, which preceded such effective date. [20 D.C.Reg. 395 (1973).]

That clear expression precludes the application of Title 34 to this proceeding. Further, the evidence had been taken and the contentions of the parties made in light of the provisions of Article 47.

## II.

■ We turn now to a detailed consideration of the Commission's conclusion that petitioner "Newsweek magazine was guilty of racial discrimination in the termination of [complainant's] employment." We hold that the Commission's findings of fact in this case were incomplete and more importantly that they were not supported by substantial evidence. Consequently we must hold that the Commission's ruling in this regard was arbitrary and capricious, an abuse of discretion, and not in accordance with the law. *Communications Workers of America, AFL–CIO v. District of Columbia Commission on Human Rights, supra.*

■ The ultimate conclusion of an administrative agency must be supported by the findings of fact and the findings must be supported by substantial evidence. D.C. Code 1973, § 1–1510(3) provides that an

administrative agency's factual determinations are subject to judicial review to the extent that the findings may be "unsupported by substantial evidence" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

We first consider whether there were adequate findings of fact to support the conclusions reached by the Commission. The District of Columbia Administrative Procedure Act, D.C.Code 1973, § 1–1509(e), requires that:

> Every decision and order adverse to a party to the case, rendered by . . . an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon *each* contested issue of fact. Findings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence. [Emphasis added.]

The Commission's order does not meet this standard.

■■■ In its "findings" the Commission often merely sets forth what the complainant's testimony was or what other witnesses said without stating it found those statements to be factual or the testimony credible. Such restatements of testimony do not constitute findings of fact by the Commission and we cannot treat them as findings. Confusion would result if an appellate court were to hold that a restatement of testimony by an administrative body constituted a finding of fact. The wording, content and omissions of the findings are controlling on appeal. The deficiencies in the findings here, as set forth in the appendix, are readily apparent on their face.

■■■ This court has admonished administrative agencies on several occasions that a reiteration of the evidence is not a finding of fact. Neither will generalized, conclusory or incomplete findings suffice. There must be a finding on each material fact necessary to support the conclusions of law. *Ditrich v. District of Columbia Board of Zoning Adjustment,* D.C.App., 293 A.2d 470,

473 (1972). As we held in *Brewington v. District of Columbia Board of Appeals & Review,* D.C.App., 287 A.2d 532, 534 (1972), "we will continue to order that administrative agencies specify the precise findings and conclusions which support their decisions."

Statements in the findings that "_____ testified that" or "in complainant's view", or "according to complainant", are not findings of fact. They fail to indicate what facts, if any, the Commission finds are established. This court in *Communications Workers of America, AFL–CIO v. District of Columbia Commission on Human Rights, supra,* encountered a problem similar to the one we find here. The division there said: "Unfortunately, the Commission's findings are inadequate for a meaningful review in this case because they do not, as they should, resolve the basic issues of fact raised by the evidence adduced at the hearing." 367 A.2d at 152. This entire problem was discussed at some length in an earlier case appealed from the Commission, but the Commission's orders in the instant case and in *Communications Workers* had already issued. We observed, for example, that findings are necessary as a basis for a meaningful review by this court and also to inform the parties of the facts proven and relied on by the Commission. We said there that "the findings set forth in the Order do not include any of the kind required by the DCAPA and the cases to legitimate administrative proceedings; *viz.,* findings of basic facts, the essential facts on which the decision rests. The Commission must show on what it relied in reaching its decision. (*See* 2 K. Davis, Administrative Law § 16.06 (1958).)" *Miller v. District of Columbia Commission on Human Rights,* D.C.App., 339 A.2d 715, 719 (1975).

In the instant case the first, and the basic, conclusion in the Commission's order is that "the respondent Newsweek magazine was guilty of racial discrimination in the termination of Mr. Yette's employment." However, the Commission did not make findings of fact directly related to his termination except that he was told he was

being dismissed without charges and to note that Mr. Yette charged respondent Elfin with racism in the decision to dismiss him.

Confronted with this deficiency we might remand the case to the Commission with an order to supply adequate findings of fact in accordance with the principles set forth above. In this instance, however, that would be a futile exercise.

A review of the testimony and the numerous exhibits does not reveal evidence that would support the conclusion reached by the Commission, that petitioners terminated the complainant's employment due to racial discrimination or that they were guilty of discriminatory practices. If such things occurred, they were not established on this record.

■ The Commission apparently was of the view that a finding that the complainant thought that he was being discriminated against would support the charge of racial discrimination. The order of the Commission relied on the complainant's subjective reaction to several events. For example, as to allegedly racially motivated jokes, it stated that the complainant "*viewed* [them] as racially derogatory." In this connection we must observe that how Mr. Yette viewed the jokes or what he thought, without more, is not controlling in determining if it involved racial discrimination. The Commission, however, attempted to buttress its conclusions by mentioning that some of the complainant's work was "combined with [the work of] others" by the editors and that certain of Mr. Yette's "stories were materially changed" before they appeared in the magazine. That is the Newsweek standard operating procedure.[6] At no point did the Commission find that these acts were discriminatory or racially motivated or, on the other hand, whether they were the result of editorial style and business necessity. Lacking something more specific we conclude the findings do not support the decision of the Commission.

In order to determine what "facts" the courts consider valid indicators of discrimination, we turn to a review of the legal evolution of the concept of racial discrimination.

Whether an employer has discriminated against an employee may be a subtle factual question that is complicated by uncertainties in the very meaning of discrimination, a term the law does not define precisely. Prior to the early 1960's courts viewed racial discrimination as an attitude based on an "evil motive", "mens rea", or "state of mind". Under this concept it was necessary to show that a person was actively motivated by dislike or hatred of the group to which the complainant belonged. Thus there had to be produced some sort of circumstantial evidence to show the employer's state of mind, in order to establish the very subjective but necessary "evil motive". Blumrosen, *Strangers in Paradise: Griggs v. Duke Power Co. and the Concept of Employment Discrimination*, 71 Mich.L.Rev. 59, 66–68 (1972) (hereinafter cited as Blumrosen, *Employment Discrimination* ), *cited in McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Holland v. Edwards*, 307 N.Y. 38, 119 N.E.2d 581 (1954). See generally A. Blumrosen, Black Employment and the Law 3–50 (1971); Bonfield, *The Substance of American Fair Employment Practice Legislation I: Employers*, 61 Nw.U.L.Rev. 907, 955–56 (1967); M. Sovern, Legal Restraints on Racial Discrimination in Employment 19–60 (1966); Lamb, *Proof of Discrimination at the Commission Level*, 39 Temp.L.Q. 299, 301 (1966); Note, *An American Legal Dilemma—Proof of Discrimination*, 17 U.Chi.L.Rev. 107, 109 (1949).

Subsequently the courts found that this concept was difficult to apply and caused them to become enmeshed in difficult problems of proof. A new, somewhat related concept of discrimination evolved to sur-

---

6. *See*, in this context, our discussion in note 1, *supra*. Apparently the Commission though it unnecessary to discuss Newsweek's general policy of assigning several reporters to "big"

assignments and then having the stories which would appear in the magazine written by a rewrite man in New York with no by-line.

mount the problems inherent in the older concept. This has been called the "equal protection" concept. This test might be viewed simply as a method of establishing the evil motive required under the earlier concept of discrimination. Under this theory discrimination consists of causing harm to a member of a minority group by treating him or her or the minority group in a different and less favorable manner than similarly situated members of the majority group with an essential element still being a purpose or motive to harm the individual because of race, but which purpose could be inferred from conduct, such as that of denying equal treatment to members of minority groups. *Whitfield v. United Steelworkers of America*, 263 F.2d 546 (5th Cir.), *cert. denied*, 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959). *See also Gregory v. Litton Systems, Inc.*, 316 F.Supp. 401 (C.D. Cal.1970), *aff'd*, 472 F.2d 631 (9th Cir. 1972); Blumrosen, *Employment Discrimination, supra* at 68–69; M. Sovern, *supra* at 70–73.[7]

When Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–15 (1970), was being considered it was argued that some earlier concepts were too restrictive. The traditional definitions of discrimination had been directed largely toward employment practices involving the unfair treatment of minorities that directly limited employment opportunities. However it was felt that discrimination could be more subtle and be the result of practices and requirements that had been imposed for other reasons. Examples of this are readily available.[8] For instance, in some urban areas, a much higher proportion of members of minority groups compared to whites were being arrested for criminal violations. Consequently a policy unrelated to job performance which prohibited employment of persons with arrest records would have the effect of excluding from employment a higher proportion of members of the minority group and thus the routine administration of the criminal laws could restrict employment opportunities of minorities.[9] Similarly, if an employer required a high school diploma and minorities had a smaller proportion of high school graduates, or if the employer required some form of intelligence test and minorities scored lower on the tests whether or not caused by past segregative policies, the diploma or test requirement could be considered to have an inherent discriminatory effect on the opportunity for employment.[10]

After the adoption of Title VII the courts, following its provisions, began to measure discrimination not only in terms of whether all persons or groups were treated equally but also as to whether the application of facially equal tests or standards

7. In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), where District of Columbia police employment tests were in issue, but not under the Civil Rights Act, the Supreme Court commented as follows regarding recent decisions of some courts of appeals:

   [I]n several contexts, including public employment, . . . the substantially disproportionate racial impact of a statute or official practice standing alone and without regard to discriminatory purpose, suffices to prove racial discrimination violating the Equal Protection Clause absent some justification going substantially beyond what would be necessary to validate most other legislative classifications. The cases impressively demonstrate that there is another side to the issue; but, with all due respect, to the extent that those cases rested on or expressed the view that proof of discriminatory racial purpose is unnecessary in making out an equal protection violation, we are in disagreement. [*Id.* at 2050 (footnote omitted).]

8. *See, e. g.,* the discussion in Blumrosen, *Employment Discrimination, supra* at 69–70. *See also* Cooper & Sobol, *Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion,* 82 Harv.L.Rev. 1598 (1969).

9. The practice of automatically disqualifying applicants with several arrests, but no convictions, when not compelled by business necessity was held unlawful under the Civil Rights Act of 1964 in *Gregory v. Litton Systems, Inc., supra. See also Green v. Missouri Pacific R. R. Co.,* 523 F.2d 1290 (8th Cir. 1975).

10. As we shall observe *infra* the Supreme Court later ruled such policies were discriminatory and illegal under the provisions of Title VII in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

would in fact operate disproportionately or unfairly on minorities by carrying over the results of past discriminatory practices. The initial court decision incorporating this holding was *Quarles v. Philip Morris, Inc.,* 279 F.Supp. 505 (E.D.Va.1968). This case involved the integration of departmental seniority systems in a previously segregated plant. Because of the passage of Title VII the employer had begun to permit employees from the formerly all-black unit to transfer to the formerly all-white unit. The employer ruled, however, that, as had been done in the past, the new transferees could not keep their seniority in the new department but had to begin at the bottom of the departmental progression ladder. The court held that this was racially discriminatory because it perpetuated past discrimination and since it had a discriminatory effect it did not matter under Title VII what the employer's intention was. It was held to be illegal discrimination that had to be remedied.

This was soon followed by similar decisions in other courts: *Parham v. Southwestern Bell Tel. Co.,* 433 F.2d 421 (8th Cir. 1970); *Local 189, United Papermakers & Paperworkers v. United States,* 416 F.2d 980 (5th Cir. 1969), *cert. denied,* 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); *Gregory v. Litton Systems, Inc., supra; Dobbins v. Local 212, IBEW,* 292 F.Supp. 413 (S.D.Ohio 1968). In these decisions under Title VII, discrimination was measured in terms of the adverse consequences inflicted upon minorities unless justified by honest and sound business practices. The test of discrimination under Title VII became the results of conduct, unless justified by business necessity since the law proscribed failing to hire, discharging or otherwise discriminating against any individual because of race. Blumrosen, *Employment Discrimination, supra* at 67–71, 81.

This approach of emphasizing "effects" (rather than "intentions") reached maturity in the Supreme Court's landmark opinion in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In *Griggs* the Court struck down on Title VII grounds, as perpetuating previous discriminatory patterns, an employer's requirement, as a condition of employment, of a high school diploma and certain standardized intelligence tests that were not demonstrably reasonably related to job performance. The Court ruled that under Title VII

> practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices. [*Id.* at 430, 91 S.Ct. at 853.]

■ However, when a complainant relies on a violation of the constitutional guarantees of due process and equal protection contained in the Fifth or Fourteenth Amendments a more rigorous standard of proof by the complainant is required. In such a situation the Constitution requires that an invidious racially discriminatory *purpose* must be found.[11]

In *Washington v. Davis,* 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), the Court ruled that District of Columbia police employment tests, neutral on their face, and job related, were not, under the constitutional standard of the Fifth Amendment, racially discriminatory solely because they have a disproportionate impact on minorities. The Supreme Court said in *Davis*: "We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today." *See also* earlier reference to *Washington v. Davis* in note 7, *supra.*

In the case at bar the evidence offered by intervenor Yette does not meet any of the tests outlined above. Certainly under the *Washington v. Davis* constitutional test it fails since there was no factual finding of a

---

11. Though, of course, the equal protection clause of the Fourteenth Amendment is not applicable to the District of Columbia, *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), the due process clause of the Fifth Amendment contains an equal protection component which essentially prohibits racial discrimination to the same extent as does the Fourteenth Amendment. *Washington v. Davis, supra.*

"discriminatory racial purpose" nor was such a purpose established by the evidence offered at the hearing. We do not have a situation here where the lack of a discriminatory racial purpose is overcome by the retention of an old and discriminatory employment practice as in *Quarles v. Philip Morris, Inc., supra,* or by a discriminatory though uniform requirement of a high school education not reasonably related to job performance as in *Griggs v. Duke Power Co., supra* and *Local 189, United Papermakers & Paperworkers v. United States, supra.*

The intervenor here made no constitutional argument but based his claim upon Title 34 of the District of Columbia Rules and Regulations and its predecessor Article 47 of the Police Regulations. Title 34, which we have previously ruled is not applicable to this case (*see* p. 783, *supra*), states in § 11.1 that:

> It shall be an unlawful discriminatory practice to [discharge an individual] . . . wholly or partially for a discriminatory reason based on the race . . . of any individual.

Article 47 provided in § 4 in part that:

> It shall be an unlawful employment practice to do any of the following acts because of the race . . . of any individual, or because of any reason that would not have been asserted but for the race . . . of any individual:
>
> (a) By an employer—to fail or refuse to hire, or to discharge, any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, including promotion, or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee.

Title VII of the Civil Rights Act (42 U.S.C. § 2000e–2(a) (1970), provides: "It shall be an unlawful employment practice for an employer—(1) . . . to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex or national origin."

As can be seen, Article 47, to a considerable extent, tracks the language found in Title VII and requires as an element that the act be committed "because of the race . . . of any individual." Title 34 on the other hand, in addition to providing that it shall be an unlawful discriminatory practice to discharge any individual based on race also incorporates the requirement "for a discriminatory reason."

While the language of Title 34 and of Article 47 in particular is necessarily of significance, we need not attempt to apply such language specifically here since even under the most liberal reading of the Title VII test, the cause of action could not stand. There is no substantial evidence in the record to establish that the conduct of petitioners complained of was taken because of the race of the complainant or that it caused him illegal discriminatory harm and was not the result of business necessity. Nor is there any proof under the earlier tests, or a finding of fact, of an "evil mind." In short, there simply is no evidence to sustain a charge under applicable law of racial discrimination.

The complainant testified on direct examination to his experience and competence as a news reporter, his work at Newsweek, and the job related problems which he said developed after the publication of his book. Throughout his direct testimony describing the history of his career at Newsweek he did not mention racism or discrimination until near the end of his testimony, when he was discussing the termination of his employment, he made a specific charge of "racism." He had testified to a few instances of respondent Elfin calling him by names other than his own which he contended were racially derogatory,[12] but which names, also had been applied to oth-

---

12. The names used were "Buster" and "Pussycat", names known to be used locally, at least, without racial connotation. The name "Pussycat" had apparently come to some public attention earlier as a result of the showing of the movie, "What's New, Pussycat?"

ers. No evidence was offered, other than his view, to establish that the names used were in fact racially derogatory. He offered no other evidence of discrimination on direct examination. On cross-examination the complainant made references to racism and discrimination in a conclusory manner without supporting facts or specific examples.

We conclude that the evidence adduced before the Commission was not sufficient to have supported a finding of racial discrimination against the complainant. Mr. Yette produced no testimony from other employees of Newsweek as to any asserted discriminatory practices. Indeed other employees, including one black reporter, testified that they had seen no evidence of discrimination. They testified that the use of nicknames was applied to all and that the names "Pussycat" and "Buster", to which Mr. Yette pointed so forcefully as evidence of racism, were applied to other persons in the office. In short, Mr. Yette failed to produce evidence that would support findings of instances of racial discrimination.

His failure to establish that his termination was motivated by a purpose to discriminate is of no little significance in view of Newsweek's detailed evidence that it was for justifiable business or professional reasons that it terminated Mr. Yette's employment. Although Mr. Yette had enjoyed a distinguished career in newspaper journalism and in government service, several of Newsweek's editors testified that his termination resulted from shortcomings they found in his work as a reporter on a weekly magazine and his inability to adjust to the Newsweek format.[13] As we indicated earlier, no findings were made by the Commission on this rather extensive testimony on a relevant issue. It has been held that it is not a violation of the Civil Rights Act to refuse to hire based on a good faith effort to explore the applicant's employment experience. *Parham v. Southwestern Bell Tel. Co., supra,* 433 F.2d at 428. It is of equal relevance in a discharge case under Article 47 to determine if the discharge may have been for a justifiable cause.

The fact that Mr. Yette later said he viewed certain actions of Newsweek as being racially motivated is not controlling and does not sustain his burden of proof. As we have indicated, it is legally insufficient to conclude, as the Commission did, that because Mr. Yette felt in the end that he was discriminated against discrimination was proved. It is not merely what the complainant thinks but rather whether the actions of the employer have an illegal adverse impact on a member of a minority group. Here there was an absence of substantial evidence to support any such findings. Accordingly, the decision of the Commission must be reversed due to a lack of evidence to support the allegations in the complaint.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court considered a charge of illegal discrimination brought under § 703(a)(1) of the Civil Rights Act arising out of petitioner's refusal to rehire the respondent because of his participation in an unlawful demonstration against it. Treating with that situation in an unanimous opinion the Court said that first the complainant must carry the initial burden of establishing a prima facie case of racial discrimination. Second, the burden shifts "to the employer to articulate some legitimate nondiscriminatory reason for the employee's rejection." Thereafter the employee must "be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact a pretext." 411 U.S. at 802–04, 93 S.Ct. at 1825.

Even assuming the intervenor here carried his initial burden, we find that the Commission failed to make meaningful findings on the second requirement even though extensive evidence was offered by the employer of "nondiscriminatory reason[s] for the employee's rejection." Finally, there was little, if any, evidence offered by intervenor to show that the employer's stated reasons were a pretext.

13. *See* note 1, *supra.*

### III.

We now consider petitioners' attack on the Commission's affirmative action award.[14] Newsweek challenges this part of the order alleging that it is a denial of procedural due process and that there was no basis in the record for such a holding. Newsweek asserts that from the beginning this case was "litigated as a discharge case relating to a single employee" and that it had no notice that the case involved "its general practices as to recruitment, hiring, and the other subjects of affirmative action programs." [15]

We turn to a consideration of the statutory provisions applicable to this part of the Commission's decision. We held in Part I., *supra,* on the authority of *Communications Workers of America, AFL–CIO v. District of Columbia Commission on Human Rights, supra,* that Title 34 is not applicable to this action since it did not become effective until after the hearing before the Commission was concluded. Consequently the affirmative action award must fall unless it can be supported under Article 47 of the Police Regulations.

Section 9(b) of Article 47 provides *inter alia* that:

> If, at the conclusion of the hearing, the Council shall determine, upon the preponderance of testimony and evidence given, that the person complained against has violated this Article, the Council shall state its conclusions and shall cause to be served upon the person complained against, its conclusions and recommendations for correction of the illegal practice, with notice that if said illegal employment practice is not corrected within fifteen (15) calendar days of the service of said conclusions and recommendations, the Council will refer the matter to the Corporation Counsel for enforcement.[16]

■ This authorizes the Commission to make recommendations for correction of the illegal practice when a violation of the article is established, with notice that if the practice is not corrected within 15 days the matter will be referred to the Corporation Counsel for enforcement. As we have previously indicated, this section does not authorize the issuance of an order for an affirmative action plan. *Communications Workers of America, AFL–CIO v. District of Columbia Commission on Human Rights, supra.* Considering the validity of this part of the order under Article 47, we note that the order deals only with the establishment of an affirmative action program and does not contain recommendations for correction of the asserted illegal practice as authorized in Article 47.

We hold that the Commission's decision ordering Newsweek to implement an affirmative action program and to make monthly reports to the Human Rights Office was not authorized by applicable law. However, since the Commission made no findings as to any other violation of Article 47 and made no recommendations for correction of Newsweek's alleged discriminatory practices we do not reach the question of whether or not the complaint was sufficiently specific to put Newsweek on notice in this regard and whether such issues were in fact fully litigated.[17]

In view of this holding and our earlier ruling that the Commission's decision that

---

**14.** The Commission found:

> In addition this panel in view of the lack of equal employment policy and affirmative action program orders Newsweek in its Washington office to forthwith establish such a policy and maintain an affirmative action program. It is further ordered that the Washington Newsweek office make regular reports to the Human Rights Office on that program.

**15.** The complaint alleged in part:

> I charge that discrimination such as I experienced at Newsweek is part of the pattern practiced by the magazine at its offices throughout the country. Blacks comprise a minute part of the regular and professional staff of the magazine and I charge that this situation exists because of the racially discriminatory policies of the company.

**16.** Comparable authority is now granted to the Commission under 34 DCRR § 33.4.

**17.** What we decide, and all we decide, is that no discriminatory practices against this intervenor have been shown.

petitioners had illegally discriminated in terminating the complainant's employment was in error,[18] the order appealed from is

*Reversed.*

## APPENDIX

### DISTRICT OF COLUMBIA COMMIS-SION ON HUMAN RIGHTS

Docket No. 1250–P

### DECISION AND ORDER

In the matter of:

SAMUEL F. YETTE, COMPLAINANT

—against—

NEWSWEEK MAGAZINE, ET AL., RESPONDENTS

BEFORE:

Commissioner Wilhelmina J. Rolark (Presiding)
Commissioner Carmen-Lydia Felices
Commissioner Rudolph A. Taylor

APPEARANCES

*For the Complainant:*

Clifford L. Alexander, Esq.
and
James A. Dobkin, Esq.
Arnold & Porter
1229 19th Street, N.W.
Washington, D.C.

*For the Office of Human Rights:*

A. Franklin Anderson, Deputy Director
Algie R. Lewis, General Counsel

*For the Respondents:*

Edward Bennett Williams, Esq.
and
Richard M. Cooper, Esq.
Williams, Connolly & Califano
1001 Hill Building
Washington, D.C. 20006

*COMPLAINT*

On January 5, 1972, Samuel F. Yette filed a complaint with the D.C. Office of Human Rights charging Newsweek Magazine, Et Al. with having engaged in the unlawful discriminatory practice in violation of Article 47 of the D.C. Police Regulations by terminating him because of his race (black).

*HEARING*

A hearing on the above complaint was duly begun at the Office of the Commission on January 30, 1973, before Commissioners Wilhelmina J. Rolark, Esq. (presiding), Dr. Carmen-Lydia Felices and Rudolph A. Taylor.

Subsequent hearing sessions were conducted on January 30, January 31, February 6, February 7, and February 26, 1973. Upon completion of the hearing the parties submitted written argument on the issues raised.

*FINDINGS OF FACTS AND CONCLUSIONS OF LAW*

After careful consideration of the evidence as a whole, including the demeanor of the witnesses, we make the following findings of fact and conclusions of law.

The complainant, Samuel Yette, is a black careerist journalist with formidable credentials. (See Transcript pps. 22–34 for experience and educational background of complaint). In January of 1968 the respondent Newsweek hired him as a correspondent in its Washington Bureau. (Tr. p. 34) During the course of his employment by Newsweek several things occurred which became an essential point of reference in this case.

At the beginning of his tenure, Mr. Yette testified that Mel Elfin, the Washington Bureau Chief, call him "Pussycat". (Tr. pp. 100–101) On several occasions the complainant conveyed his displeasure at the name to Mel Elfin but despite this nearly a year elapsed before he ceased calling him by the name. (Tr. p. 102) On other occasions, the Bureau Chief attempted to draw inferences that Yette, simply because of his

---

**18.** Since we hold as we do, it is unnecessary for us to reach petitioners' other issues, one of which, the exclusion of the designated Newsweek representative from the hearing room, we find to be quite troublesome.

race, would have to "know" certain black public figures in Washington, D.C. about the importance of whose views on issues complainant differed with Mel Elfin. Finally, the respondent Elfin had a habit of telling jokes which were viewed as racially derogatory by complainant. (Tr. p. 341) Both of these habits were complained about by the complainant to the Bureau Chief. The panel views this information as a necessary background for the following series of events concerning complainant's employment at Newsweek.

In the beginning Yette, the only black correspondent in the Washington Bureau had no difficulty in performing his assignments. It was his testimony that during all the many interviews that preceded his employment by Newsweek he never understood the difference between duties to be assumed by him at Newsweek and those hitherto performed by him at other publications. After his initial assignments Dr. King's death occurred. It was the assignment connected with the death that began the series of incidents leading to the complaint in this case.

Mr. Yette balked at attempting to get a story on the policies of succession in SCLC which Newsweek desired him to get within an hour of the funeral. The complainant's story on the funeral was combined with others. In addition another incident occurred with Yette at Newsweek concerning black children which Yette found hard to take. (Tr. pp. 63–64)

During the civil disturbances which followed the death of Dr. King Yette was assigned to talk with actual participants in the disturbance. This he did. He found later that his stories were materially changed. His attempt to get the stories changed back to his original version were unsuccessful. The final publication included the altered stories. The complainant wrote a letter of complaint and threatened to leave because of the incident.

During all of his final year the complainant never received a regular beat or assignment. Actually from the inception right down to the end of his career at Newsweek

complainant never received a regular beat or assignment. Viewing his credentials this would appear questionable.

Actually, most of the assignments received by Mr. Yette were heavily weighed in view of his blackness—apparently from the testimony of one of respondent's witnesses this appears to be the pattern at Newsweek.

Despite this, the respondent made liberal use of the files prepared by complainant for their publication without giving him credit.

To illustrate the caliber of Mr. Yette's performance at Newsweek he had 22 "periscopes" during his first year and (there are short features of public interest) [sic] successfully completed his first year with commendation.

A review of his second year at Newsweek indicated that other employees picked up the habits of Mr. Elfin, e. g., once he was called "Sambo" and the employee involved felt that if the Managing Editor persisted in name calling with no apparent ill effect on Yette, he could do so. The use of the offensive names of "Pussycat" and "Buster" were not stopped by Mr. Elfin until Yette threatened to cease his assignments.

For the first part of his second year at Newsweek complainant performed well, including public appearances. About mid-year, Yette in an appearance on Meet The Press asked questions of George Schultz, the then Secretary of Labor, concerning the Job Corps. These questions were not answered. It was testified to by the respondent that when he returned from that interview he was chided by the Managing Editor concerning his public criticism of the Nixon Administration on racial matters. (Tr. p. 132)

Also, it was the complainant's view that following this appearance he was asked to go on vacation, although he didn't want to and wanted to continue work. (Tr. p. 133) Upon his return to work a white reporter had his desk and had become the recipient of some assignments previously handled by Yette.

By summer of his second year all of his assignments had been curtailed. Mr. Yette complained in writing about these events; a harassing series of events followed, involving assignments, sudden changes, etc. Finally, from 1970 until his termination, complainant, according to him, was relegated to education assignments and lectures. In the meanwhile Mr. Yette had completed his book, "The Choice: Issues of Black Survival in America", which had as one of its themes the perpetration of wars by America, the war in Vietnam and the war against colored people in U.S.A. According to the complainant (Tr. p. 173) in his book "America in the 1970's" was viewed by him as a police state in which black people would have difficulty surviving.

According to the complainant the appearance of his book, February 1971, engendered hostile reaction at Newsweek. Specifically he stated Mr. Elfin found the book personally embarrassing and embarrassing to Newsweek.

Meanwhile, Mr. Yette's work, though done according to instruction did not appear in Newsweek. Even "long interviews" performed by him on order did not appear in Newsweek.

Finally, Mr. Elfin suggested Mr. Yette should find "other" employment considering his talent. (Tr. pp. 78–79) In the meanwhile assignments nearly ceased. Upon confronting Elfin with this failure to assign him Yette was met with a violent outburst, according to him (Tr. pp. 166–167). A subsequent conference with Elfin so disturbed complainant, he contacted the New York office to get further information on statements attributed to New York office by Elfin. At a meeting set up in September with the New York Editor, Mr. Yette was informed he was being dismissed with no charges.

Admittedly standards for the job and for consideration of his dismissal were purely subjective.

During the course of the meeting, Mr. Yette charged Mr. Elfin with racism in his name calling, refusal to give him assignments, and decision to dismiss him and asked for a meeting with the big chief. Mr. Yette met him late in September whereupon his delay in leaving the job was extended until January 1972 during all of which time, September through January, he received no assignments.

During all of this time there was no black correspondent in the Washington Bureau. (Tr. pp. 580–583)

The respondent in his presentation claimed personal credit for the employment of Yette. This he admitted was due to the fact that they wanted a black reporter and he wanted to get the best. (Tr. p. 743) He stated there was no personal policy delineated in a positive fashion such as a manual, that hiring was done at Newsweek on a personal referral basis. (Tr. pp. 580–583) He stated the decision to hire Yette as the first black correspondent was due to his sterling qualifications.

In his testimony Mr. Elfin referred to criticism of Mr. Yette's work in New York and by editors but never indicated a transmittal of this information to Yette although he stated he had many conversations with Yette.

Mr. Elfin stated Mr. Yette never lodged any complaints with anyone at Newsweek concerning his complaint of racial discrimination in name calling or assignments. However, there was no established procedure for lodging such complaints. The two blacks used as witnesses by the respondent were both inferior in status to Mr. Yette.

At no time during the hearing was there ever any evidence given that Newsweek had anything in the nature of a published equal employment policy or an affirmative action program targeted against racial imbalance in its minority correspondents.

The respondent's answer to the use of nicknames and jokes was that it was his policy to use nicknames and tell jokes.

## OPINION

It is the opinion of this panel that the respondent Newsweek magazine was guilty of racial discrimination in the termination of Mr. Yette's employment.

During the course of his employment by Newsweek respondent was never fully accorded the status he should have received as a correspondent. In this panel's opinion the lack of personnel guidelines, admitted by the respondents during their testimony, allowed a purely subjective standard to be employed. Despite the difficulties of assessing discriminatory practices in view of the subjective standards used, this panel conclude they existed in viewing and weighing all the evidence—the name calling, the racial jokes, the nature of the assignments given, the withdrawal of assignments after the publication of a book geared around an analysis of racism in America, the lack of an affirmative action or equal employment policy, and most damaging of all the paucity of black employees.

The panel dismisses as without merit the contention of the respondent that the hearing proceeded without due process because: (1) absence of panel members; (2) rule on witnesses when his case was presented. The panel members were present substantially all of the time. The transcript makes reference to the minute amount of time they were absent. The chair person was present throughout the hearing. The transcript of the testimony with its corrections made by respondent all of which were admitted was at all times available to the panel which is thoroughly familiar with it.

Mr. Gander of Newsweek was represented by competent counsel who was assisted by counsel. To have allowed him to be present when the rule was called for by the complainant would have been prejudicial to the complainant. In this panel's discretion the rule was allowed.

### ORDER

Discrimination is a humiliating and demeaning experience. Even though Mr. Yette was kept on at Newsweek following his dismissal, no assignments were given him during that period. This panel awards him $1,000.00 in damages.

The complainant having proved his case and having had to employ counsel for an expert presentation of same is hereby awarded reasonable counsel fees. The complainant's attorneys are hereby ordered to present a claim for attorney's fees supported by a statement of service within two weeks after the date of this order. The respondent's counsel will be given an opportunity after presentation of this claim to file his objections to same.

In addition this panel in view of the lack of equal employment policy and affirmative action program orders Newsweek in its Washington office to forthwith establish such a policy and maintain an affirmative action program. It is further ordered that the Washington Newsweek office make regular reports to the Human Rights Office on that program.

Dated Dec. 5, 1973

/s/ Wilhelmina J. Rolark
WILHELMINA J. ROLARK
Commissioner

/s/ Carmen-Lydia Felices
CARMEN–LYDIA FELICES
Commissioner

/s/ Rudolph A. Taylor
RUDOLPH A. TAYLOR
Commissioner

On Petition of Intervenor for Rehearing En Banc.

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER, NEBEKER, YEAGLEY, HARRIS and MACK, Associate Judges.

### ORDER

PER CURIAM.

On consideration of the petition of intervenor, Samuel F. Yette, for rehearing *en banc* and of petitioners' response thereto, it is

ORDERED that intervenor's petition is denied.

MACK, Associate Judge:

Statement of Reasons For Voting to Grant Intervenor Yette's Petition for Rehearing En Banc.

NEWMAN, Chief Judge, joins in this statement.

## I.

More than three years after the District of Columbia Commission on Human Rights held, unanimously, that the petitioners (Newsweek et al.) had engaged in a racially discriminatory employment practice, a division of this court has reversed the agency's decision as being arbitrary and capricious, an abuse of discretion, not in accordance with the law, and not based on substantial evidence. Having first determined that the agency's factual findings, made after a five-day hearing, were incomplete, my colleagues did not remand for further findings, but themselves concluded that there is no evidence in the record to sustain a charge of "racial discrimination." In my opinion this is simply not the case, and I think the court has overstepped the permissible bounds of appropriate review in making its own assessment of the evidence without regard to any findings of the administrative agency.

More importantly, the conclusion of the division, and the reasoning on which it is based, reflect a distressingly superficial understanding of the identity of employment discrimination—discrimination which the federal courts have characterized as the most pressing social problem of our time[1] and which the Congress has described as "a complex and pervasive phenomenon," the recognition and correction of which requires, in many instances, "not only expert assistance, but also the technical perception that the problem exists in the first instance." S.Rep. No. 92–415, 92d Cong., 1st Sess. 5 (1971); H.R.Rep. No. 92–238, 92d Cong., 1st Sess. 8 (1971).

I state briefly the factual background against which my concern is measured.

The complaint filed with the Human Rights Commission by intervenor, Samuel Yette, a black journalist, charged the petitioners (his employer, Newsweek, et al.) with discriminatory treatment in his working conditions, assignments and discharge, which he alleged, reflected a pattern of racially discriminatory policies by the magazine. It was undisputed that Mr. Yette came to Newsweek's Washington Bureau as a distinguished journalist and newsman and that he worked there for more than three and a half years before being told that his employment was being terminated. It was likewise undisputed, and the court can take judicial notice of the fact, that Newsweek is a distinguished news medium whose format and operation are necessarily distinct from those of daily publications. Finally, it was undisputed that Yette was the first black correspondent ever to be hired in the Washington Bureau; that throughout his tenure, he was the only black reporter so employed; that during that period (nearly four years), five whites were hired; that hiring was accomplished through "word of mouth" contacts with employees; that the Bureau had no affirmative action plan nor any printed or published policy with respect thereto; and that Yette, who received many informal compliments from coworkers, never was given an evaluation of his performance during the period of his employment.

As to the narrow issue in dispute—Yette's claim of discriminatory treatment versus Newsweek's assertion of Yette's incompetence—the evidence included, on the one hand, the testimony of Yette that he was constantly embarrassed by, and objected to, crude racial references and nicknames, that a disproportionate number of his assignments were related to race, that he was kept for the most part on general "clean-up" assignments, and that eventually—after publication of his book THE CHOICE: ISSUES OF BLACK SURVIVAL IN AMERICA—meaningful assignments ceased altogether. On the other hand, there was the testimony of an imposing array of Washington and New York-based Newsweek employees—predominantly male professionals with service going back many years—who attested to the fact that they had observed no prejudice at the Bureau, that Yette's work (which some admittedly had complimented) was not up to Newsweek standards, that he failed to apprise his supervisor of his whereabouts, and

---

1. *See, e. g., Culpepper v. Reynolds Metals Co.,* 421 F.2d 888, 891 (5th Cir. 1970).

that Newsweek had not been offended by Yette's book but had in fact helped him promote it. The assessment of these witnesses as to the absence of discrimination was shared by a black reporter, a "full-fledged" correspondent from another bureau who had started as an intern in the Washington Bureau. This reporter (whose appearance as a witness merited comment by the court) testified that he had a "keen sensitivity to discrimination . . . almost like radar," and that "after growing up in the South . . . whenever a person speaks to you in such a way that you feel he harbors racial discrimination in his heart, you can tell almost immediately." (It is of no moment that this lay witness demonstrated a lack of "technical perception"; my concern is that this court has taken from the Human Rights Commissioners—presumably appointed because they possessed technical perception—the task, *inter alia,* of assessing the credibility of witnesses and determining the weight to be accorded their testimony.)

Whatever the adequacy of the Commission's written findings, the factors upon which it based its conclusion are clear:

In this panel's opinion the lack of personnel guidelines, admitted by the respondents during their testimony, allowed a purely subjective standard to be employed. Despite the difficulties of assessing discriminatory practices in view of the subjective standards used, this panel concludes they existed in viewing and weighing all the evidence—the name calling, the racial jokes, the nature of the assignments given, the withdrawal of assignments after the publication of a book geared around an analysis of racism in America, the lack of an affirmative action or equal employment policy, and *most damaging of all the paucity of black employees.* [Emphasis added.]

Since every one of the enumerated factors finds substantial support in the record, I do not see how the division can characterize the Commission's conclusion as arbitrary and capricious.

Despite its review of the "legal evolution of the concept of racial discrimination," I fear that in reversing the Commission, the division has accepted the petitioners' premise that the "subject matter in this record requires no special expertise to understand." Thus there is much preoccupation with the inferences that cannot be drawn from the petitioners' use of nicknames, and little or no treatment of the inferences that can be drawn from racial statistics. In contrast, the federal courts, charged in effect by statute with enforcing prohibitions against employment discrimination, recognized very early the significance of statistics in uncovering discrimination. *See, e. g., Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 225 n. 34 (5th Cir. 1974); *Brown v. Gaston County Dyeing Machine Co.,* 457 F.2d 1377, 1382 (4th Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); *United States v. Jacksonville Terminal Co.,* 451 F.2d 418, 442 (5th Cir. 1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421, 426 (8th Cir. 1970); *Jones v. Lee Way Motor Freight, Inc.,* 431 F.2d 245, 247 (10th Cir. 1970), *cert. denied,* 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). In many cases the only available avenue of proof is the use of such statistics. *United States v. Ironworkers Local 86,* 443 F.2d 544, 551 (9th Cir. 1971).

As the United States Supreme Court only recently reaffirmed,

our cases make it unmistakably clear that '[s]tatistical analyses have served and will continue to serve an important role' in cases in which the existence of discrimination is a disputed issue. [*International Brotherhood of Teamsters v. United States,* —— U.S. ——, ——, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (citations omitted).] [2]

---

2. *See also Hazelwood School District v. United States,* —— U.S. ——, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

Moreover the Supreme Court has left no doubt that statistics showing the existence of a discriminatory hiring pattern and practice can establish a prima facie case of discrimination against an individual. *Id.* Reviewing the order and allocation of proof in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (discussed by the division in the instant case), the Court cautioned that the *McDonnell Douglas* pattern was not the only means of establishing a prima facie case of individual discrimination. Pointing to *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), it explained:

> The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. [*Teamsters, supra,* —— U.S. at ——, 97 S.Ct. at 1868.]

In its consideration of the instant case, the Human Rights Commission attached great weight to the underutilization of blacks in both professional and nonprofessional positions in the Bureau's workforce—a fact which, standing alone, could be urged as a prima facie showing of a pattern of discrimination, thus placing upon the petitioners the burden of showing that evidence of a discriminatory policy was inaccurate or insignificant. *Teamsters, supra,* —— U.S. at —— – ——, 97 S.Ct. 1843. Here, Newsweek, in its scramble to show that Yette was incompetent (lending itself to vulnerability as offering pretext—*see McDonnell Douglas, supra,* 411 U.S. at 798, 804, 807, 93 S.Ct. 1817) failed to come forward with any significant evidence to rebut the prima facie showing of a discriminatory policy (as, for example, evidence that during the period in question it made too few employment decisions to justify an inference that it engaged in a regular practice of discrimination).

I go through this analytical exercise only to suggest that the division of this court, in holding that there was no evidence in the record to support the Commission's finding, has followed a course that would make it well-nigh impossible for any victim of employment discrimination to prove this fact. That is why I think this case deserves the attention of the full court.

## II.

A jurisdictional issue also merits comment. In ordering Newsweek to establish an affirmative action plan and in awarding damages and attorneys fees to intervenor Yette, the Commission purported to act under Title 34 of the D.C. Rules and Regulations. The division of our court has agreed with petitioners that Title 34, adopted after the Commission's hearing was concluded, was not available as a basis for relief. Therefore, the court held, the Commission's action was based on D.C. Police Regulation Article 47. Since that provision does not, according to the division, authorize the relief ordered, the affirmative action order and awards must fail.[3]

In his petition for rehearing en banc, intervenor Yette has argued that if the Commission's action was based on the Police Regulation (Art. 47), as the court held, then this court lacks jurisdiction to review the decision, since Article 47 empowered the Commission only to issue recommendations for correction of an illegal practice which might then be enforced through a separate enforcement proceeding initiated in the Superior Court. Art. 47, § 9(b). *Cf. Sonderling Broadcasting Corp. v. District of Columbia Minimum Wage and Industrial Safety Board,* D.C.App., 315 A.2d 828 (1974). I think this is a sound observation, despite the rather indignantly expressed view of the petitioners that "[i]t is patently silly to argue that the Court has no jurisdiction to review the administrative decision and order simply because the Commission had no jurisdiction to make it." This jurisdictional problem was not addressed by the

---

3. In view of the division's finding of no discrimination, the preoccupation with remedy seems unnecessary.

division. In the interest of orderly procedure, I think it should be resolved for if Yette is correct, there was nothing before the court to review.

### III.

I would note, in conclusion, that millions of Americans recently sat before their television sets mesmerized by the dramatization of the heritage of another black writer.[4] It is a tribute to our psychological growth that we found this production not only entertaining but historically informative. It does not take much imagination to realize that vestiges of that history remain deeply ingrained, though dimly perceived, in the very fabric of our society as the "institutionalized" discrimination to which the Congress has alluded. In my opinion it is time, therefore, that we stop recoiling in a personal sense of outrage at every suggestion of "racism." It is a time, not to think in terms of "blame" or "fault" or "guilt," but rather to make a calm and reasoned assessment as to whether there is in any given situation a residue of discriminatory "consequences" from the past,[5] and if so, whether we can devise a remedy which might eliminate those effects with the least cost in human suffering. The area of employment—an area in which the federal courts have already fashioned objective standards for identifying discrimination and affirmative plans for its elimination—would be a good place to start.

I would grant this petition for rehearing en banc.

---

**4.** I refer, of course, to Roots, by Alex Haley.

**5.** *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).